John P. Stennett, SBN: 72815
Barbara A. Casino, SBN: 91952
**STENNETT/CASINO**
Attorneys at Law
501 W. Broadway, Suite 1340
San Diego, California 92101
(619) 544-6404
Fax: (619) 233-3796
(SC@StennettCasino.com;
BCasino@StennettCasino.com)

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRI SMITH and MICHELE SMITH FREGOSO,<br><br>                 Plaintiff,<br><br>v.<br><br>STONEBRIDGE LIFE INSURANCE COMPANY,<br><br>             Defendant. | Case No. C:08-01466 (JCS)<br><br>PLAINTIFFS' NOTICE OF AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT<br><br>U.S. Magistrate Judge Joseph C. Spero<br><br>DATE:     September 26, 2008<br>TIME:     9:30 a.m.<br>CTRM:   A |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RELIEF SOUGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    STATEMENT OF THE MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    The Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    Death of Ms. Hall-Hussain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    Policy Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.    Plaintiffs' Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.    Defendant's Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            1.    The Drug Exclusion Does Not Preclude Coverage . . . . . . . . . . . . . . . 8

            2.    The Exclusion for Loss Due to Treatment
                  of a Disease Does Not Apply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

1

# TABLE OF AUTHORITIES

2

**CASES**                                                                                        **Page**

3

AIU Insurance Company v. Superior Court
      51 Cal.3d 807 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

4

Arata v. California-Western States Life Ins. Co.
      50 Cal.App.3d 821 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

5

6

Bornstein v. J.C. Penney Life Insurance Company
      946 F.Supp. 814 (C.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10, 11

7

8

Celotex Corp. v. Calrett
      477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

9

Chale v. Allstate Life Insurance Co.
      353 F.3d 742 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

10

11

Frazier Searle v. Allstate Life Insurance Co.
      38 Cal.3d 425 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

12

Holloway v. J.C. Penney Life Insurance Company
      190 F.3d 838 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9

13

14

Heighly v. J.C. Penney Life Insurance Company
      257 F.Supp.2d 1241 (C.D.Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 2, 10, 12

15

Hummel v. Continental Casualty Insurance Company
      254 F.Supp.2d 1183 (D. Nev. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 12

16

17

Julian v. Hartford Underwriters Insurance Company
      35 Cal.4th 747 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18

Kahatchatrian v. Continental Casualty Co.
      332 F.3d 1227 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

19

20

Olinsky v. Railway Mail Assoc
      182 Cal. 669 (1920) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21

Waller v. Truck Ins. Exch. Inc.
      11 Cal.4th 1 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 13

22

Warren v. City of Carlsbad
      58 F.3d 439 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

23

24

Weil v. Federal Kemper Life Assurance Co.
      7 Cal.4th 125 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

25

Williams v. American Casualty Co.
      6 Cal.3d 266 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

26

27

Zucherman v. Underwriters at Lloyds, London
      42 Cal.2d 460 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28

1

**TABLE OF AUTHORITIES (continued)**

2

**STATUTES**

3

4

California Evidence Code § 1281 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5

California Ins. Code § 106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

6

California Ins. Code § 530 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7

California Ins. Code § 1644 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8

California Ins. Code § 10369.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

9

California Ins. Code §§ 10369.2 to 10369.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 12

10

Fed. Rules Civ. P 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION**

NOTICE IS HEREBY GIVEN that on September 26, 2008, at 9:30 a.m. in Courtroom A of this Court, before United States Magistrate Judge JOSEPH C. SPERO, plaintiffs will and hereby do move the Court for a Partial Summary Judgment on the First Cause of Action for Breach of Contract.  This motion is brought on the grounds that there is no genuine issue as to any material fact and plaintiffs are entitled to judgment as a matter of law.

This motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the Declaration of John P. Stennett, the Declaration of Michele Smith Fregoso, the Exhibits filed herewith, the parties Agreement Statement of Facts, and the pleadings and papers on file herein, and upon other matters as may be presented to the Court at the time of the hearing.

**RELIEF SOUGHT**

Plaintiffs are seeking judgment under their First Cause of Action for breach of the insurance contract for the amount of the accidental death policy of $50,000.00 plus interest and costs.

**POINTS AND AUTHORITIES**

**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.  STATEMENT OF THE MOTION**

Plaintiffs TERRI SMITH and MICHELE SMITH FREGOSO'S complaint seeks insurance benefits following the death of their mother, DIANE GERALDINE HALL-HUSSAIN, under an accidental death policy issued by defendant STONEBRIDGE LIFE INSURANCE COMPANY in the amount of $50,000.00.  Their complaint sets forth causes of action for breach of contract and tortious breach of the implied covenant of good faith and fair dealing.  Jurisdiction in the Federal Court is based on the parties' diversity of citizenship.  Thus, the substantive law of the State of California applies.

Plaintiffs' Motion for Summary Judgment is brought solely on the first cause of action for

1    breach of contract.  The facts relevant to the issues regarding the claimed breach of contract are

2    not in dispute and the issue of coverage and policy interpretation are issues of law for the Court.

3    (Waller v. Truck Ins. Exch., Inc. (1995) 11 Cal.4th 1).

4           Decedent died on April 9, 2007 as a result of an accidental overdose of Oxycodone.

5    Oxycodone is a pain medication that was prescribed by decedent's physician for intractable pain.

6           STONEBRIDGE denied plaintiffs' claim for benefits under the accident death policy

7    based on two exclusions contained within the policy.  Those exclusions read as follows:

8                  "No benefit shall be paid for injury that:

9                  . . .

10                 3.  is caused by or results from the Covered Person's taking or

11                 using any narcotic, barbiturate or any other drug unless taken or

12                 used as prescribed by a Physician; or

13                 . . .

14                 7. is due to disease, bodily or mental infirmity, or medical or

15                 surgical treatment of these."

16

17          The first exclusion cited does not apply in that it is broader than allowed under California

18   Insurance Code § 10369.12 which does not allow an insurance company to exclude a loss caused

19   by medication prescribed by a physician.  (See Hummel v. Continental Casualty Insurance

20   Company, 254 F.Supp.2d 1183, 1189).

21          The second exclusion cited by STONEBRIDGE also does not apply since death was not

22   due to disease or treatment thereof, but rather from the accidental overdose of Oxycodone.

23   (Heighley v. J.C. Penney Life Insurance Company, 257 F.Supp.2d 1241 (C.D.Cal. 2003)).

24   Additionally, the exclusion for disease or loss due to the treatment thereof as interpreted by

25   STONEBRIDGE is more limiting than allowed under Insurance Code § 10369.12 cited above.

26   Thus to the extent that it is inconsistent with the California Insurance Code it is void.  (Holloway

27   v. J.C. Penney Life Insurance Company, 190 F.3d 838).

28

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.C.P. 56(c).  Summary judgment is not proper if factual material exists for trial.  Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  Celotex Corp. v. Calrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial.  Id. at 324, 106 S.Ct. 2548.

In this case the issue is whether the two limitations cited by defendant precludes coverage under the accidental death policy.  The facts surrounding decedent's death and the issuance of the policy to decedent are not in dispute.  The dispute lies on the interpretation of the policy in light of California law and whether there is coverage under the circumstances of this case.  This is purely a question of law to be determined by the Court.  (Waller v. Truck Ins. Exch., Inc. (1995) 11 Cal.4th 1.

## III.  STATEMENT OF FACTS

In 2005, Diane Geraldine Hall-Hussain purchased an accidental death policy over the internet with STONEBRIDGE LIFE INSURANCE COMPANY.  She named her two daughters, TERRI SMITH and MICHELLE SMITH FREGOSO as her co-beneficiaries (Answer to Complaint ¶ 5).

### A.    The Policy.

The policy is entitled "Accidental Death and Dismemberment Coverage." (Exhibit A at pg 3).  The coverage provisions of the policy read as follows:

1
2
3

> "If, as a result of injury . . . , a covered person suffers any of the following losses within 90 days after the date of an accident which caused such injury, we will pay the benefit shown below:" (Exhibit A at pg 5).

4    For loss of life the principle sum of $50,000.00 is payable. (Exhibit A at pg 3, 5).

5    The policy includes a list of exclusions. The following two were relied upon by

6    STONEBRIDGE to deny benefits:

7    > "No benefit shall be paid for injury that:

8
9

> 3. is caused by or results from the Covered Person's taking or using any narcotic, barbiturate or any other drug, unless taken or used as prescribed by a Physician;

10
11

> 7. is due to disease, bodily or mental infirmity, or medical or surgical treatment of these." (Exhibit A at pg 5).

12    The last relevant provision of the policy is the following:

13    > CONFORMITY WITH STATE STATUTES

14
15

> The provisions of this policy must conform with the laws of the state in which you reside on the Effective Date. If any do not, they are hereby amended to conform. (Exhibit A at pg 7).

16    The policy is an "accidental results" policy, not an "accidental means" policy. Thus, only the

17    result has to be unexpected (in this case death) in order for there to be coverage. In an

18    "accidental means" policy both the "means" and the "result" have to be accidental to invoke

19    coverage. (Bornstein v. J.C. Penney Life Insurance Co. (C.D. Cal. 1996) 946 F.Supp. 814 held

20    that an identical policy was an "accidental results" policy. J.C. Penney Life Insurance Company

21    was the predecessor to Stonebridge Life Insurance Company in 2002 (Stennett Decl. Exhibit 1).

22

23    **B.    Death of Ms. Hall-Hussain.**

24    At the time of her death on April 9, 2007, decedent was 59 years old and carried a

25    diagnosis of diabetes and peripheral neuropathy (Exhibit C). Her primary care physician, Dr.

26    Chen, had prescribed decedent Oxycodone to relieve pain associated with the peripheral

27    neuropathy. A few days prior to her death, Dr. Chen had increased decedent's dosage of

28    Oxycodone because of breakthrough pain (Exhibit D; Undisputed Fact ("UF") No. 15, 16). The

1   Humboldt County Coroner's Office investigated the death and concluded that it was caused by an

2   overdose of Oxycodone (Exhibit C; UF No. 10).  This finding was based on a toxicological report

3   that found that the level of Oxycodone in decedent's blood was 0.25 mg/L which was in excess of

4   the effective therapeutic level.  The lab also reported that the potentially toxic level of Oxycodone

5   started at 0.2 mg/L (Exhibit B).

6        The Coroner's Office  reported that the death was "accidental" (Exhibit B) as opposed to

7   suicidal based on the findings of Deputy Horton who testified in his deposition as follows:

8              [Q.]  So when you use the term 'accidental,' you're using that to
               mean that Ms. Hall-Hussain did not intend to commit suicide?  She
9              did not intend to take her own life; is that correct?
               A.  Correct.
10             Q.  And you base that conclusion on the fact that there was no suicide note?
               A.  No suicide note and from talking to the family, that she had –
11             she was a happy, normal person that didn't – well, never threatened
               suicide to them.  And also the toxicology levels, that's one thing I
12             was going to – I forgot previously.  When we get toxicology levels
               back, this was the low end of potentially toxic.  When – typically
13             when we see suicides by overdose, it will be several times toxic
               ranges, up into the outer limits.  And that's one way we can
14             confirm that yes, this probably was intentional because it's so far
               over the toxic range.  (Stennett Decl. Exhibit 3 at pg 45:5-12).

15

16       Decedent's daughter, MICHELE SMITH FREGOSO, describes in her declaration how

17  close decedent was with her family and how she financially supported her brother and grandson.

18  Decedent was the matriarch of the family and loved to cook at all the family gatherings.  She was

19  an avid reader and Ebay trader.  Her death was a surprise to her family and clearly was accidental.

20  (Declaration of Michele Smith Fregoso).

21       The policy was in full force and effect at the time of decedent's death and plaintiffs made a

22  timely claim for accidental death benefits.  (Answer to Complaint, ¶¶ 5 and 8; UF No. 2, 17).

23       By letter dated June 12, 2007, STONEBRIDGE advised plaintiffs that it was denying the

24  claim for death benefits based on two exclusions under the policy (Exhibit E; UF No. 19).

25

26                              **IV.  ARGUMENT**

27  **A.      Policy Interpretation.**

28       When interpreting the language of an insurance policy words should be interpreted in their

1   "ordinary and popular sense." (California Civil Code § 1644; <u>AIU Insurance Company v.</u>

2   <u>Superior Court</u> (1990) 51 Cal.3d 807, 821-822).

3           Under statutory rules of contract interpretation, the mutual
            intention of the parties at the time the contract is formed governs
4           interpretation. (California Civil Code § 1636). Such intent is to be
            inferred, if possible, solely from the written provisions of the
5           contract. The "clear and explicit" meaning of these provisions,
            interpreted in their "ordinary and popular sense" unless "used by
6           the parties in a technical sense or a special meaning is given to them
            by usage" (§ 1644), controls judicial interpretation. (§ 1638).
7           Thus, if the meaning a layperson would ascribe to contract
            language is not ambiguous, we apply that meaning. (<u>AIU Insurance</u>
8           <u>Company v. Superior Court</u> at page 822).

9   However if there is no plain meaning and the terms are ambiguous

10          In the insurance context, we generally resolve ambiguities in favor
            of coverage. (cite omitted). Similarly, we generally interpret the
11          coverage clauses of insurance policies broadly, protecting the
            objectively reasonable expectations of the insured. (cite omitted).
12          These rules stem from the fact that the insurer typically drafts
            policy language, leaving the insured little or no meaningful
13          opportunity or ability to bargain for modifications. (cite omitted).
            Because the insurer writes the policy, it is held 'responsible' for
14          ambiguous policy language, which is therefore construed in favor of
            coverage. (<u>AIU Insurance Company v. Superior Court</u>, supra, at
15          page 822).

16      Even if the language of the policy is "plain and clear" and "unambiguous" there are

17  situations where the limitations in the policy would still not be enforced. Where a policy

18  limitation is contrary to an insurer's statutory obligations, the limitation is unenforceable no

19  matter how plain and clear it may be stated. (See <u>Julian v. Hartford Underwriters Insurance</u>

20  <u>Company</u> (2005) 35 Cal.4th 747 in which the court held unenforceable a provision in the

21  homeowners policy that denied coverage for loss "caused directly or indirectly" by excluded perils

22  "regardless of any other cause or event contributing concurrently or in any sequence to the loss."

23  The Court held that the causation limitation conflicted with California Insurance Code § 530

24  which requires an insurer to cover a loss whose proximate cause is a covered peril regardless of

25  the fact that other contributing causes may be excluded.)

26

27      **B.      Plaintiffs' Burden of Proof.**

28      Plaintiffs, as the beneficiaries under the policy, have the burden of  proving

(1)    That DIANE GERALDINE HALL-HUSSAIN is deceased; and

(2)    That the cause of death was accidental.

(Zucherman v. Underwriters at Lloyds, London (1954) 42 Cal.2d 460, 473-474).

Under California Evidence Code § 1281, a death certificate is admissible to prove the fact of death under an exception to the hearsay rule. There is no dispute that Ms. Hall-Hussain died on or about April 9, 2007. (UF No. 5).

The Coroner's Office found that the overdose was accidental based on a combination of factors. First, the amount of Oxycodone in decedent's system was at the low end of the toxic level and inconsistent with an attempted suicide. Second, no suicide note was found. Third, after discussions with family members it was clear that decedent had not been despondent or suicidal. The declaration of the daughter filed herewith confirm the fact that decedent's death was purely accidental. (Stennett Decl. Exhibit 3 at pg 45:5-12, pg 62:19-pg 65:6; Decl. of Michele Smith Fregoso).

Defendant asserts that Ms. Hall-Hussain's death was not accidental. The term *accident* is not defined in the policy. Under California case law an accident is something that happens suddenly and unexpectedly and involves "some form of external events and forces, as opposed to purely 'natural' processes...." Kahatchatrian v. Continental Casualty Co. (9th Cir. 2003) 332 F.3d 1227, 1229 (applying California law. Accidental death is an unintended and undesigned result even if caused by the insured's voluntary acts.

> Policies requiring only that there be proof of accidental death are construed broadly, such that injury or death is likely to be covered unless the insured virtually intended his injury or death...." (Weil v. Federal Kemper Life Assurance Co. (1994) 7 Cal.4th 125, 140).

Thus, even if decedent intentionally took more Oxycodone than she was directed by her physician, her death would be considered accidental if she did not intend or expect to die from the dosage. To find that decedent's death was not accidental one would have to find that decedent not only intentionally took the medication but also intended or expected death to follow.

> Where the death is the result of some act, but was not designed and not anticipated by the deceased, though it be in consequence of some act voluntarily done by him, it is accidental death.... In other

words, accidental death is an unintended and undesigned result, arising from acts done." (Olinsky v. Railway Mail Assoc (1920) 182 Cal.669, 672-673).

## C.    Defendant's Burden of Proof.

Defendant STONEBRIDGE as the insurer has the burden of proving all facts that would give rise to the application of an exclusion to coverage under the policy.  (Frazier Searle v. Allstate Life Insurance Co. (1985) 38 Cal.3d 425, 436).  Thus STONEBRIDGE has the burden of proving either that decedent did not have a prescription for Oxycodone or that a disease or the treatment thereof was the proximate cause of her death.

### 1.    The Drug Exclusion Does Not Preclude Coverage.

STONEBRIDGE'S policy which provides "accidental death and dismemberment coverage" is considered a disability policy under the California Insurance Code (Cal.Ins.Code § 106).  (Williams v. American Casualty Co. (1971) 6 Cal.3d 266, 276-277).

The California Insurance Code sets forth provisions that must be contained within disability policies and also sets forth the exclusions that may be included in disability policies. The limitations and exclusions that may be contained in a disability policy delivered or issued to a person in the State of California are set forth in sections 10369.2 to 10369.12, inclusive. No limitations or exclusions are allowed in disability policies which are "less favorable in any respect to the insured or the beneficiary." (Section 10369.1).

California Insurance Code § 10369.12 provides:

A disability policy may contain a provision in the form set forth herein.

Intoxicants and controlled substances: The insurer shall not be liable for any loss sustained or contracted in consequence of the insured's being intoxicated or under the influence of any controlled substance *unless administered on the advice of a physician*. (emphasis added).

STONEBRIDGE denied plaintiffs' claim based on an exclusion that reads:

No benefit shall be paid for injury that:

...

3. is caused by or results from the Covered Person's taking or using any narcotic, barbiturate or any other drug, unless taken or *used as prescribed by a Physician*; (emphasis added).

STONEBRIDGE'S exclusion violates California law in that it is broader than is allowed by statute. Thus, the provision is rewritten to conform to the California Insurance Code. (Holloway v. J.C. Penney Life Insurance Co., 190 F.3d 838). STONEBRIDGE asserts that the insured took more than the prescribed amount of Oxycodone resulting in her death and thus was not taking the medication as prescribed by her physician. It truly does not matter if she was taking more than was prescribed by her physician. The statutory language "*administered on the advice of a physician*" has been interpreted by the courts as "not imposing the strict requirement of following prescribed doses to the letter." (Hummel v. Continental Casualty Insurance Company, 254 F.Supp.2d 1183, 1189).

In the Hummel case, Mrs. Hummel made a claim for accidental death benefits following the death of her daughter, Erica. Erica had been prescribed Oxycodone to alleviate her migraine headaches. Her prescription directed that the Oxycodone be taken twice a day as needed. She apparently took substantially more than was prescribed and died as a result of the overdose. Continental Casualty denied the claim citing the policy provision identical to STONEBRIDGE which excluded loss from "*drugs unless taken as prescribed by a physician*." The court, however, interpreted the limitation as broader than that allowed by law which interpreted the statutory damages "*administered on the advice of a physician*" as not requiring the insured to take the medication as prescribed.

This exact same issue was litigated in the United States District Court case of Legare v. Canada Life Assurance Co.  Enclosed herewith is the court's "Findings of Fact and Conclusions of Law" following trial of the matter (Stennett Dec. Exhibit 2). Therein the court states

Defendants have also failed to prove the substances found in Mr.

Legare's system were not administered on the advice of a physician. Contrary to defendant's argument, the statutory language does not require a showing the decedent was taking the medication exactly as prescribed. Following the rationale of Hummel . . . the court finds the focus of the statutory limitation is to exclude losses resulting from the illegal use of drugs as opposed to legitimate use of a controlled substance pursuant to a physician's advice. (Page 3:lines 18-24).

## 2.    The Exclusion for Loss Due to Treatment of a Disease Does Not Apply.

The medical treatment of disease exclusion does not apply because decedent did not die as a result of treatment but rather died as a result of an accidental overdoes of Oxycodone - a negligent act resulting in death. This analysis is consistent with Heighley v. J.C. Penney Life Insurance Co., 257 F.Supp.2d 1241 (C.D.Cal. 2003)[1] in which the Court denied defendant's motion for summary judgment on a claim for accidental death benefits where the underlying facts were that plaintiff had died on the operating table. The Court held that the plaintiffs had presented sufficient evidence to claim that the insured did not die of natural causes but rather as a result of an accidental act by the physician (malpractice).  The Court acknowledged that the accident need not be the sole cause of death, but rather that the modern test is whether it is the "efficient proximate cause" of death.

In Bornstein v. J.C. Penney Life Insurance Company (C.D. Cal. 1996) 946 F.Supp. 874, the court addressed a similar question on summary judgment where the beneficiaries of an accidental death policy claimed that the death of the insured (a 74 year old man who died of a stroke following coronary by-pass surgery) was accidental and not the proximate result of disease. In denying the insurance company's motion for summary judgment, the court stated:

Furthermore, even where disease is specifically excluded in the policy (as in the life policies at issue here) and is a contributing factor in the death of the insured, coverage may still be afforded. And where disease is one factor in the death of an insured, the clause 'directly and independently of all other causes' will not necessarily serve to defeat the insurer's obligation to provide coverage.  Arata v. California-Western States Life Ins. Co., 50

---

[1]   J.C. Penney Life Insurance Company changed its name to STONEBRIDGE in June 2002.  (Stennett Decl. Exhibit 1).

Cal.App.3d 821 (1975).  In Arata, the deceased was insured under a life insurance policy which provided double indemnity in the event of death resulting from 'accidental bodily injury, directly and independently of all other causes . . . but not payable . . . if death . . . is contributed to by: disease . . ."  50 Cal.App.3d at 823.  The insured was a hemophiliac who slipped and fell (accidentally, the court determined) and who bled internally until he died a few days later.  The accidental fall and hemophilia were jointly causative.  But for either, the insured would have survived.  The court ordered the insurer to pay the double indemnity, finding that 'a preexisting disease or illness although contributing to the loss resulting from the accident, does not relieve the insurer of liability where the accident is the proximate cause of death.' 50 Cal.App.3d at 825.  Bornstein v. J.C. Penney Life Insurance Co 946 F.Supp. 814, 819. (C.D.Cal 1996).

In Chale v. Allstate Life Insurance Co., 353 F.3d 742 (9th Cir. 2003), the issue was whether there was coverage under an accidental death policy where the insured, while climbing a mountain died of high altitude pulmonary edema and high altitude cerebral edema. The Court held that not only was the insured's death accidental because it was unexpected, but also that the disease exclusion did not apply. The Court noted that the definition of disease is exceptionally broad in common usage, but that it must be "narrowly construed in the context of insurance policies." Thus, the Court defined disease as an "ailment or disorder of an established or settled character to which the insured is subject." The Court found that decedent's affliction was both sudden and unexpected.

"It is true that someone who is freezing to death or drowning certainly suffers from a physiological abnormality. But in neither case could the affliction be considered so 'established' or 'settled' as to amount to a 'disease.' For both disorders, the onset is sudden and the outcome either death or rapid rescue from the brink of death." (At page 749).

Decedent herein had been taking Oxycodone for two years without incident. (Stennett Decl. Exhibit 3, at pg 23:24-pg 24:12).  The overdose caused a sudden spike in the blood concentrations of the drug into the toxic level that caused a "physiological abnormality" or "injury" that resulted in her death.  Death was not expected by decedent.  Thus, by definition, it was "accidental."

There is no definition of the terms, *disease* or *treatment* in the policy.  However as shown above, the Courts narrowly construe these terms when they are contained in a clause limiting coverage.  To interpret the provision as STONEBRIDGE has not only is inconsistent with case law but also would result in a limitation, when applied to these facts, that is broader than that allowed under California Insurance Code § 10369.12 cited above.  STONEBRIDGE'S interpretation of the *treatment exclusion* as applied here is violative of the California prohibition against excluding losses caused by prescribed medication, whether taken as prescribed or not.  The California Insurance Code allows an insurer to limit coverage for injury caused by illicit drugs or alcohol but not for injures caused by medication prescribed by a physician.

## V.  CONCLUSION

Defendant STONEBRIDGE has the burden of proof to establish the applicability of the two exclusions upon which it relied in denying coverage under the subject accidental death policy.  The drug exclusion relied upon by STONEBRIDGE does not apply because the drug causing death was prescribed by decedent's physician (Hummel v. Continental Casualty Insurance Company, 254 F.Supp.2d 1183, 1189).

The medical treatment of disease exclusion relied upon by STONEBRIDGE also does not apply.  The "efficient proximate cause" of Diane Geraldine Hall-Hussain's death was not the treatment she was receiving for intractable pain, but rather the accidental overdose of Oxycodone.  Ms. Hall-Hussain's death was sudden, unexpected and unintended.  It was not the result of a disease process or the treatment therefor.  (Heighley v. J.C. Penney Life Insurance Company, 257 F.Supp.2d 1241 (C.D. Cal. 2003).

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

1      There are no issues of fact presented on the issues of coverage.  Coverage is a question of

2  law for the Court.  (<u>Waller v. Truck Ins. Exchange</u> (1995) 11 Cal.4th 1).  Plaintiffs are thus

3  requesting judgment be entered in their favor on the First Cause of Action for breach of the

4  insurance contract.

5                                              Respectfully submitted,

6                                              STENNETT/CASINO
                                               Attorneys for Plaintiffs

7

8                                              By   /s/     *BARBARA A. CASINO*

9                                                        BARBARA A. CASINO

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SMITH v. STONEBRIDGE LIFE INSURANCE COMPANY**

U.S. DISTRICT COURT
CIVIL ACTION NO. C 08-01466 JCS

**DECLARATION OF SERVICE BY ELECTRONIC FILING**

I, the undersigned declare:

That I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action; and I am employed in the County of San Diego, State of California, at the law offices of Stennett & Stennett in which county the within mentioned mailing occurred.  My business address is 501 W. Broadway, Suite 1340, San Diego, CA 92101.

On August 15, 2008,  I served the following documents:

PLAINTIFFS' NOTICE OF AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT; DECLARATION OF JOHN P. STENNETT IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; DECLARATION OF MICHELE SMITH FREGOSO; PROPOSED ORDER

on the following named person by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

MANATT, PHELPS & PHILLIPS
MARGARET LEVY
JOSEPH E. LASKA
11355 West Olympic Boulevard
Los Angeles, CA 90064
(mlevy@manatt.com; jlaska@manatt.com)
Attorneys for Defendants

BY ELECTRONIC FILING & SERVICE VIA CM/ECF: I transmitted a true copy of the above-entitled document to CM/ECF on _8-15-08___.  I caused all of the above-entitled documents to be sent to the recipients noted via CM/ECF Filing Receipt page will be maintained with the original documents in our office.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2008, at San Diego, California.

_/s/ BARBARA A. CASINO_____
BARBARA A. CASINO
bcasino@stennettcasino.com



1   John P. Stennett, SBN: 72815
    Barbara A. Casino, SBN: 91952
2   **STENNETT/CASINO**
    Attorneys at Law
3   501 W. Broadway, Suite 1340
    San Diego, California 92101
4   (619) 544-6404
    (619) 233-3796 (FAX)
5   (SC@StennettCasino.com;
    BCasino@StennettCasino.com)
6

7   Attorneys for Plaintiffs

8                **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11 TERRI SMITH and MICHELE SMITH FREGOSO, | ) Case No. C:08-01466 (JCS) |
| 12 | ) |
| | ) DECLARATION OF JOHN P. STENNETT |
| Plaintiffs, | ) IN SUPPORT OF |
| 13 | ) PLAINTIFFS' NOTICE OF AND |
| | ) MOTION FOR PARTIAL SUMMARY |
| 14 | ) JUDGMENT ON PLAINTIFFS' FIRST |
| | ) CAUSE OF ACTION FOR BREACH |
| 15 v. | ) OF CONTRACT |
| | ) |
| 16 STONEBRIDGE LIFE INSURANCE COMPANY, | ) U.S. Magistrate Judge Joseph C. Spero |
| 17 | ) |
| | ) DATE:      September 26, 2008 |
| 18         Defendant. | ) TIME:      9:30 a.m. |
| | ) CTRM:      A |
| 19 | ) |

20       I, JOHN P. STENNETT declare as follows:

21         1.     I am an attorney licensed to practice before the courts of the State of California

22       and this Court. I am the attorney of record for plaintiffs in the within action. I

23       have personal knowledge of the facts set forth in this declaration except those

24       matters stated on information and belief which I believe to be true. If called as a

25       witness I can and will testify competently to all those facts.

26         2.     Attached as **EXHIBIT 1** are true and correct copies of the California Department

27       of Insurance Company profile for STONEBRIDGE LIFE INSURANCE

28       COMPANY, reflecting that prior to June 6, 2002, STONEBRIDGE LIFE

Declaration of John P. Stennett                                Case No. C:08-01466 (JCS)

1    INSURANCE COMPANY was known as J.C. Penney Life Insurance Company.

2    Plaintiffs are requesting that the Court take judicial notice of the above fact set

3    forth in Exhibit 1 under F.R.E. 201 (see <u>Disabled Rights Action Committee v. Las</u>

4    <u>Vegas Events, Inc.</u> (9th Cir. 2004) 375 F.3d 861, 866, fn.1, in which the Court

5    took judicial notice of public records.).

6    3.    Attached as **EXHIBIT 2** are true and correct copies of the "Findings of Fact and

7         Conclusions of Law Following Bench Trial" filed February 18, 2004 from <u>Legare</u>

8         <u>v. Canada Life Assurance Company</u>, U.S. District Court, Southern District of

9         California, Case Number 02-CV-0798.

10    4.    Attached as **EXHIBIT 3** are true and correct copies of excerpts from the

11         transcript deposition of Humboldt County Deputy Coroner Roy Horton taken on

12         April 11, 2008.

13    I declare under penalty of perjury under the laws of the United States of America that the

14    foregoing is true and correct and that this declaration was executed on August 14, 2008.

15

16

17                                    JOHN P. STENNETT

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1



Company Profile

   Company Search

   Company Search
Results

   Company
Information

   Old Company
Names

   Agent for Service

   Reference
Information

   NAIC Group List

   Lines of Business

   Company
Performance &
Comparison Data

Financial Statements
PDF's

   Annual Statements

   Quarterly
Statements

   CA Supplements

Company Complaint

   Company
Enforcement Action

   Composite
Complaints Studies

Additional Info

   Find A Company
Representative In
Your Area

   Financial Rating
Organizations

   View Financial
Disclaimer

**COMPANY PROFILE**

**Company Information**

### STONEBRIDGE LIFE INSURANCE COMPANY

### 4333 EDGEWOOD ROAD NE
### CEDAR RAPIDS,  IA 52499
### 800-527-9027

**Old Company Names**              **Effective Date**

J. C. PENNEY LIFE INSURANCE COMPANY      06/06/2002

VERMONT ACCIDENT INS CO             02/02/1968

**back to top**

**Agent For Service**

JERE KEPRIOS
C/O CT CORPORATION SYSTEM
818 WEST SEVENTH STREET, 2ND FLOOR
LOS ANGELES   CA   90017

**back to top**

**Reference Information**

| NAIC #: | 65021 |
|---|---|
| California Company ID #: | 1681-6 |
| Date Authorized in California: | 11/06/1961 |
| License Status: | UNLIMITED-NORMAL |
| Company Type: | LIFE/DISABILITY |
| State of Domicile: | VERMONT |

**back to top**

**NAIC Group List**

   NAIC Group #:         0468      Aegon US Holding Grp

**back to top**

**Lines Of Business**

The company is authorized to transact business within these lines of insurance.

EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CASE NO. C 08-01466 JCS

. . .


TERRI SMITH and MICHELLE
SMITH FREGOSO,

             Plaintiffs,

     vs.

STONEBRIDGE LIFE INSURANCE
COMPANY,

             Defendants.
_____/


D E P O S I T I O N

O F

DEPUTY CORONER ROY HORTON

. . .

FRIDAY, APRIL 11, 2008

. . .

11:00 A.M.

. . .


VALERIE WALKER, CSR #7209

**CRNICH DEPOSITIONS**
626 H STREET, EUREKA, CA. 95501
TELEPHONE 707 443-4870
FAX 707 443 4870
CONFERENCE ROOMS

1  that time?

2     A.   He told me that the decedent's brother had come

3  over to the apartment and discovered his sister dead.

4     Q.   And the decedent's brother's name was Calvin

5  Hall?

6     A.   That's correct.

7     Q.   Was Mr. Hall still there at the time that you

8  arrived?

9     A.   I believe he had left.  I don't remember if he

10  was still -- at some point in my investigation he went

11  out -- I went outside to talk to him, but I don't

12  believe -- I don't remember seeing him there initially

13  when I arrived.

14     Q.   It is possible he had left and then come back?

15     A.   Correct.

16     Q.   Because you did speak with him in person that

17  day?

18     A.   Yes.

19     Q.   Did you take down Mr. Hall's personal information

20  when you met with him?

21     A.   Yes.  I believe I took down his phone number.

22     Q.   Did you take down any other information?

23     A.   Just next of kin information.  I believe I took

24  down his phone number.  I believe just his phone number.

25     Q.   Did you take down his address?

1    A.   Yes.

2    Q.   Do you know where that information is right now?

3    A.   No, I don't.  It was in my notes.  After the

4  initial investigation, I dealt with various people so

5  I'm not sure what happened to his address.

6    Q.   You didn't put his address in the death

7  investigation report, did you?

8    A.   No.

9    Q.   But you believe that you took it down in your

10  handwritten notes?

11    A.   Yes.

12    Q.   Do you still have those notes?

13    A.   No.

14    Q.   Do you know what you did with them?

15    A.   We destroy the notes after my file report is

16  written.

17    Q.   So it's your practice to destroy your handwritten

18  notes after you prepare your final report?

19    A.   Yes.

20    Q.   Is there a particular reason for that?

21    A.   No.  After my main report is written and my

22  narrative, we always -- it's our -- not policy, but it's

23  my personal policy to destroy my notes.

24    Q.   Do you have access to Mr. Hall's address or phone

25  number as we sit here now?

1  this case involves an accidental death policy.  And so
2  exactly what is an accident is an issue in this case.
3  It's a legal issue, but I want to make sure I understand
4  factually what your testimony is.
5       So when you use the term "accidental," you're
6  using that to mean that Ms. Hall-Hussain did not intend
7  to commit suicide?  She did not intend to take her own
8  life; is that correct?
9     A.   Correct.
10    Q.   And you base that conclusion on the fact that
11 there was no suicide note?
12    A.   No suicide note and from talking to the family,
13 that she had -- she was a happy, normal person that
14 didn't -- well, never threatened suicide to them.  And
15 also the toxicology levels, that's one thing I was going
16 to -- I forgot previously.  When we get toxicology
17 levels back, this was the low end of potentially toxic.
18 When -- typically when we see suicides by overdose, it
19 will be several times toxic ranges, up into the outer
20 limits.  And that's one way we can confirm that yes,
21 this probably was intentional because it's so far over
22 the toxic range.
23    Q.   In this case, Ms. Hall-Hussain -- OxyContin is an
24 oral medication, correct?
25    A.   Yes.

45

1     Q.   And you said you didn't have any discussions with

2     either of them about your testimony here today?

3     A.   No.

4     Q.   Are you being paid for your testimony here today?

5     A.   No.

6         MR. LASKA:   Counsel, I'm going to go back

7     through my notes to see if I have anything else to ask.

8     But do you want to ask questions in the meantime?

9         MR. STENNETT:   Sure.

10        MR. LASKA:   I'm reserving my right to go

11    back an ask more questions, but go ahead.

12

13                      EXAMINATION

14    BY MR. STENNETT:

15    Q.   Deputy Horton, Jack Stennett, I'm talking to you

16    from San Diego.  I do have your report and the death

17    certificate and I want to clarify a couple of things.

18    A.   Sure.

19    Q.   One is, you mentioned looking at the

20    toxicological report.  You mentioned that the finding of

21    oxycodone in her bloodstream was at the low end of

22    potentially toxic level and that had some meaning to

23    you.  Can you explain that to me?

24    A.   Yes.   Sometimes that's our basis on

25    determining -- let me back up a little bit.  When we get

1   these toxicology reports, effective level is what they
2   expect to see someone on a regimen of these drugs.
3   There's low and high levels of that.  And potentially
4   toxic is cases I believe they can verify that the person
5   has actually died from those levels.

6        But what we look at is whether we're trying to
7   decide between suicide and accident, is where those
8   levels are in that range.  The low end of potentially
9   toxic, that means that, gee, it may have teetered over
10  from the effective level, or someone that's used to
11  taking that drug went into the actually potentially
12  toxic range.

13       Q.  Accidentally as opposed to intentionally?

14       A.  Yes.

15       Q.  And you have investigated cases where there's
16  been an intentional suicidal overdose of medication?

17       A.  Yes.

18       Q.  Have you learned anything from those
19  investigations as to what you typically find as far as
20  the toxic level goes?

21       A.  Yes.

22       Q.  Can you tell me what you would typically find in
23  a case where you concluded there was suicide?

24       A.  Typically those cases are even three or four
25  times over the higher scale of potentially toxic, the

1  higher range of potentially toxic.  We'll see those

2  ranges three to four times higher.

3      Q.   In this particular case there is no range for

4  potentially toxic.  It just has a number of .2

5  milligrams?

6      A.   Yes.  That's the reference given by the lab.

7      Q.   Okay.  So, again, carrying through this thought

8  process, it was consistent, if you were thinking that

9  this was a suicide, you would expect to see what kind of

10  a level of oxycodone --

11          What would you expect to have found as to the

12  toxic level of Ms. Hall-Hussain's blood system of

13  oxycodone if you were suspecting this was a suicide?

14          MR. LASKA:  Object.  It calls for

15  speculation.  It's an improper hypothetical.

16          You can answer the question.

17          THE WITNESS:  On Ms. Hall-Hussain's level it

18  was .2 milligrams per liter.  Oh, that's potentially

19  toxic.  Hers was .25.  Excuse me.

20  BY MR. STENNETT:

21      Q.   If it was atypical what you found to be a

22  suicidal attempt or actually suicide, what is the range

23  that you would expect to find?

24      A.   Typically what we find is that the number would

25  be more like 1.2 to 3.2.  So you'd be over another

1   decimal point into the 1.2 -- 2.2, 3.2.

2       Q.   Okay.   So that was one of the factors that you

3   took into account in considering that this is an

4   accidental overdose as opposed to a suicidal overdose;

5   is that correct?

6       A.   That's correct.

7       Q.   The other factors you indicated I think was there

8   was no suicide note?

9       A.   Correct.

10      Q.   Is that something that you typically in your

11  experience find when you conclude there's a suicide?

12      A.   I would say probably we find a note 50 percent of

13  the time.

14      Q.   Then the other factor you considered was with

15  family members, correct?

16      A.   Yes.

17      Q.   There had been no discussion with family members,

18  she appeared to enjoy her family, enjoy her life.

19      A.   Correct.

20      Q.   Now, was this amount of oxycodone in her system,

21  .25, would you describe that as being the high end of

22  potentially toxic level or the low end of potentially

23  toxic level?

24      A.   The low end.

25      Q.   Would the number of hours that you indicated was

EXHIBIT 3

*Smith file*



```
FILED

FEB 1 8 2004

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY
```

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

LYNNE LEGARE,

                       Plaintiff,

     vs.

THE CANADA LIFE ASSURANCE
COMPANY, et al.,

                      Defendants.

CASE NO. 02cv0798 DMS (NLS)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW
FOLLOWING BENCH TRIAL**

     The above entitled case came on regularly for trial on January 26, 2004. John P. Stennett, Esq. appeared on behalf of Plaintiff, and Shelby B. Sears, Esq. of Harrington, Foxx, Dubrow & Canter appeared on behalf of Defendants. After reviewing the evidence and hearing argument of counsel, the Court hereby issues the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.    Arthur Legare died in an automobile accident that occurred on March 29, 1999.

2.    Mr. Legare collided with a bicyclist on the highway shoulder that may have resulted in the bicyclist sustaining a fractured wrist.

3.    Mr. Legare then collided with the rear of two other vehicles, neither collision resulting in any bodily injuries.

///

89

02cv0798

4.    Ultimately, Mr. Legare collided with the rear of a van that was stopped on the freeway. This collision resulted in an explosion of the van's gas tank. The resulting fire consumed Mr. Legare and his automobile.

5.    The County of San Diego Autopsy Report declared the cause of death as inhalation of products of combustion and extensive body burns with contributing factors of blunt trauma injuries.

6.    Two medications were found in Mr. Legare's bloodstream after his death: Soma, a muscle relaxant, and Tylenol with Codeine Number 3, an analgesic. These medications were prescribed by Mr. Legare's physician for long-standing back pain.

7.    The officers that investigated the accidents leading up to Mr. Legare's death suggested he violated California Vehicle Code Section 20001, Misdemeanor Hit and Run.

8.    Plaintiff Lynne Legare is Arthur Legare's wife. She is also the beneficiary of her husband's group accidental death policy issued by Defendant Canada Life.

9.    The insured benefits were provided as part of an employee benefit plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq.

10.    The plan provided for benefits to be paid to Plaintiff in the amount of $68,000 if her husband died accidently.

11.    Canada Life denied Plaintiff's claim for benefits citing two exclusions in the policy. The first exclusion stated: "No payment will be made under this provision if the loss, or injury leading to the loss, occurs while: (1) in the course of operating a motor vehicle; (a) under the influence of an intoxicant . . . ." Canada Life also denied the claim under the exclusion that provided no coverage if the loss occurred while "committing or attempting to commit a felony."

## CONCLUSIONS OF LAW

12.    Under ERISA, state insurance regulations are saved from preemption. 28 U.S.C. § 1144(6)(2)(A).

13.    California Insurance Code Section 10369.12 provides:

A disability policy may contain a provision in the form set forth herein.

- 2 -

Intoxicants and controlled substances: The insurer shall not be liable for any loss sustained or contracted in consequence of the insured's being intoxicated or under the influence of any controlled substance unless administered on the advice of a physician.

14.    This Court finds the controlled substances exclusion of the Canada Life policy is more restrictive than that allowed under California Insurance Code Section 10369.12. Accordingly, Canada Life's policy must be rewritten to conform with California law.

15.    Canada Life has the burden of proving each of the three elements of California Insurance Code Section 10369.12. Those elements are whether Mr. Legare's death was (1) in consequence of (2) being under the influence of a controlled substance and (3) whether the substances found in Mr. Legare's system were "not administered on the advice of a physician."

16.    In determining the first element, the Court follows the cases of <u>Garvey v. State Farm</u>, 48 Cal. 3d 395 (1989) and <u>Olsen v. American Banker's Ins. Co. of Florida</u>, 30 Cal. App. 4th 816 (1994). These cases require the intoxication to be the predominant cause of the loss. The evidence presented to the Court demonstrates that several factors may have contributed to Mr. Legare's death, including the design of the gas tank, the explosion thereof, and Mr. Legare's intoxication. In light of this evidence, Defendants have failed to prove Mr. Legare's intoxication was the predominant cause of the loss.

17.    Defendants have also failed to prove the substances found in Mr. Legare's system were not administered on the advice of a physician. Contrary to Defendants' argument, the statutory language does not require a showing the decedent was taking the medication exactly as prescribed. Following the rationale of <u>Hummel v. Continental Casualty Ins. Co.</u>, 254 F.Supp.2d 1183, 1189 (D. Nev. 2003), the Court finds the focus of the statutory limitation is to exclude losses resulting from the illegal use of drugs as opposed to the legitimate use of a controlled substance pursuant to a physician's advice. In this case, the parties agree the drugs found in Mr. Legare's system were prescribed by his physician.

18.    Defendants have also failed to present any evidence to support their argument the felony

///

///

- 3 -

1    exclusion of the policy applies in this case.  The only evidence presented to the Court
2    suggested Mr. Legare violated California Vehicle Code Section 20001, which is misdemeanor
3    hit and run.
4    19.      Having failed to prove the elements under California Insurance Code Section 10369.12
5    and the felony exclusion of the policy, the Court finds Plaintiff is entitled to the benefits under
6    her husband's accidental death policy issued by Defendant Canada Life.
7        **IT IS SO ORDERED**.
8    DATED:  _2-18-04_
9                                                            _____
                                                            DANA M. SABRAW
                                                            United States District Judge
10   cc:    all parties
11          Judge Stormes
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

02cv0798

1  STENNETT/CASINO
   BARBARA A. CASINO; 091952
2  JOHN P. STENNETT; 72815
   501 West Broadway, Suite 1340
3  San Diego, CA 92101
4  (619) 544-6404
   (619) 233-3796 Fax
5  bcasino@stennettcasino.com

6  Attorneys for Plaintiffs

7

8                UNITED STATES DISTRICT COURT

9                SOUTHERN DISTRICT OF CALIFORNIA

10 TERRI SMITH and MICHELLE SMITH         CASE NO. 08-01466 JCS
11 FREGOSO,
                                           Magistrate Judge Joseph C. Spero
12         Plaintiffs,
                                           DECLARATION OF MICHELLE
13                                         SMITH FREGOSO IN SUPPORT OF
                                           PLAINTIFFS' MOTION FOR PARTIAL
14            vs.                          SUMMARY JUDGMENT
15 STONEBRIDGE LIFE INSURANCE
16 COMPANY,
17         Defendant
18

19

20    I, MICHELLE SMITH FREGOSO declare as follows:

21        I am a Plaintiff in the within action and daughter of the decedent, Diane Geraldine

22 Hall-Hussain. I have personal knowledge of all facts set forth below and if called upon to

23 testify under oath in this matter, I could and would testify to the following:

24        1.    I currently reside and have resided for the past 17 years in Eureka, California

25 approximately 2-3 miles from where my mother resided.

26        2.    I was very close with my mother and would talk with her 2-3 days per week

27 and see her on an average once a week.

28 ///

                    DECLARATION OF MICHELLE SMITH FREGOSO
                                    Page 1

1      3.     My mother died on April 9, 2007 at the age of 59.

2      4.     At the time of her death my mother was very close with her entire family but
3  especially with her younger brother Calvin and grandson, Alex.

4      5.     At the time of her death she was not only financially supporting her younger
5  brother, Calvin but would actually fix meals for him daily.

6      6.     My eldest son, Alex was her favorite grandson and after her death I
7  discovered that my mother had been sending Alex money every month to help pay his
8  apartment rent.

9      7.     Although my mother did complete 2 years of college, we considered her to be
10  self-educated in that she was an avid reader and read several newspapers every day.

11      8.     Early on in my mother's career she worked as a residential behavioral
12  specialist taking care of mentally challenged individuals.

13      9.     Later in life she earned money by buying and selling items on E-Bay.
14  Although she was 59, she was quite versatile and kept mentally active.

15      10.    My mother was definitely the matriarch of the family and attended every
16  family function.

17      11.    She loved to cook and was the predominant cook at all family functions.

18      12.    She loved her children and especially her grandchildren and had a zest for
19  life.

20      13.    I was first notified of my mother's death by my Uncle Calvin.  I immediately
21  went to her apartment.

22      14.    Although the police and coroner were still at the scene, I did not speak with
23  either of them and was not questioned regarding my mother's custom or habit of safe
24  keeping her medications.

25      15.    On the day of her death I took my mother's handbag from her apartment and
26  discovered it contained her pill organizer.  My mother kept a pill organizer in her purse in
27  which she kept both medications and vitamins.  The organizer contained pills for Monday
28  through Sunday.

1      16.    My mother would also keep some of her medications in a medicine chest in

2  her bedroom. She kept both vials of pills and other pill organizers in the chest.

3      17.    Sometime after my mother's death I was notified by the coroner's office that

4  her death was due to an accidental overdose of Oxycodone.

5      I declare under penalty of perjury the forgoing is true and correct.

6

7  Date:  June 16, 2008

8                           MICHELLE SMITH FREGOSO

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8                   **UNITED STATES DISTRICT COURT**

9                 **NORTHERN DISTRICT OF CALIFORNIA**

10

11   TERRI SMITH and MICHELE SMITH        )        Case No.  C 08-01466 (JCS)
     FREGOSO,                             )
12                                        )        [PROPOSED] ORDER GRANTING
                                          )        PLAINTIFFS' MOTION FOR PARTIAL
13                   Plaintiff,           )        SUMMARY JUDGMENT
                                          )
14   v.                                   )
                                          )
15   STONEBRIDGE LIFE INSURANCE           )        U.S. Magistrate Judge Joseph C. Spero
     COMPANY,                             )
16                                        )        DATE:        September 26, 2008
                                          )        TIME:        9:30 a.m.
17                   Defendant.           )        CTRM:        A
     ─────────────────────────────────── )
18

19          The Motion for Partial Summary Judgment filed by plaintiffs TERRI SMITH and

20   MICHELE SMITH FREGOSO came on regularly for hearing before the Court on September 26,

21   2008.  After full consideration of the evidence and authorities submitted by the parties, including

22   oral argument, the Court grants Plaintiffs' Motion in full, granting judgment in favor of plaintiffs

23   and against defendant in the amount of the accidental death benefits of $50,000.00 plus interest

24   and costs.

25          IT IS SO ORDERED.

26          Dated: _____

27                                          _____
                                            UNITED STATES MAGISTRATE JUDGE
28