John P. Stennett, SBN: 72815
Barbara A. Casino, SBN: 91952
**STENNETT/CASINO**
Attorneys at Law
501 W. Broadway, Suite 1340
San Diego, California 92101
(619) 544-6404
(619) 233-3796 (FAX)
(SC@StennettCasino.com;
BCasino@StennettCasino.com)

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TERRI SMITH and MICHELE SMITH FREGOSO, | ) ) ) | Case No. C:08-01466 (JCS) |
| | ) ) | PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| STONEBRIDGE LIFE INSURANCE COMPANY, | ) ) ) | U.S. Magistrate Judge Joseph C. Spero |
| | ) ) | DATE: September 26, 2008 |
| Defendant. | ) ) | TIME: 9:30 a.m. |
| | ) | CTRM: A |

Plaintiffs' Response to Defendant's
Motion for Summary Judgment                                    Case No. C:08-01466 (JCS)

## TABLE OF CONTENTS

Page

I.    CALIFORNIA INSURANCE CODE § 10369.12 APPLIES
      TO STONEBRIDGE'S ACCIDENTAL DEATH POLICY  . . . . . . . . . . . . . . . . . . . . 1

      A.    THE APPLICATION OF § 10369.12 IS NOT
            LIMITED TO GROUP INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B.    § 10369.12 APPLIES TO THE POLICY REGARDLESS
            OF WHETHER THE COMMISSIONER APPROVED
            THE POLICY FORM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      C.    THE POLICY DRUG EXCLUSION IS LESS FAVORABLE
            THAN THAT ALLOWED BY STATUTE  . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   THE POLICY'S MEDICAL TREATMENT CLAUSE
      DOES NOT EXCLUDE PLAINTIFFS' LOSS  . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    MEDICAL TREATMENT WAS NOT THE EFFICIENT
            PROXIMATE CAUSE OF DECEDENT'S DEATH  . . . . . . . . . . . . . . . . . . 5

      B.    THE MEDICAL TREATMENT EXCLUSION AS
            APPLIED BY STONEBRIDGE IS VIOLATIVE OF
            THE CALIFORNIA INSURANCE CODE  . . . . . . . . . . . . . . . . . . . . . . . . . 7

      C.    HOW MUCH OXYCODONE WAS TAKEN
            BY MS. HALL-HUSSAIN?  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.  CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1

<u>TABLE OF AUTHORITIES</u>

2

**CASES**                                                                      **Page**

3

4

<u>Arata v. California Western States Life Insurance Co.</u>
       50 Cal.App.3d 821 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5

<u>Barkerding v. Aetna Life Insurance Co.</u>
       82 F.2d 358 (5th Cir. 1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6

7

<u>Bayless v. Travelers Insurance Co.</u>
       2 F.Cas. 1077 (E.D.N.Y. 1877) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8

<u>Bornstein v. J.C. Penney Life Insurance Co.</u>
       946 F.Supp. 814 (C.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

9

10

<u>Dice v. General Electric Capital Assurance Co.</u>
       93 F. Apx. 68 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

11

<u>Garvey v. State Farm Fie & Cas. Co.</u>
       48 Cal.3d 395 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

12

13

<u>Heighley v. J.C. Penney Life Insurance Co.</u>
       257 F.Supp.2d 1241 (C.D. Cal 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

14

<u>Holloway v. J.C. Penney Life Insurance Co.</u>
       190 F. 3d 838 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15

16

<u>Hummel v. Continental Casualty Insurance Co.</u>
       254 F.Supp.2d 1183 (D.Nev. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

17

<u>Legare v. Canada Life Assurance Co.</u>
       So. Dist. California No. 02 CV 0798 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18

19

<u>New Amsterdam Casualty Company of Perryman</u>
       162 Miss. 864 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20

<u>Olson v. American Bankers Insurance Co</u>
       30 Cal.App.4th 816 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

21

22

<u>Twohey v. Lincoln National Life Insurance Co.</u>
       273 F. 3d 817 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

23

<u>Wilson v. Businessmen's Assur. Co. of America</u>
       181 F.2d 88 (9th Cir. 1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

24

25

26

27

28

1

**STATUTES** **Page**

2

California Insurance Code § 1040.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3

California Insurance Code § 10270 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4

California Insurance Code § 10273.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5

California Insurance Code § 10273.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6

California Insurance Code § 10277 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

7

California Insurance Code § 10278 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

8

California Insurance Code § 10290 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

9

California Insurance Code § 10369.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

10

California Insurance Code § 10369.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

11

California Insurance Code § 10369.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 4, 7

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**I.**

## CALIFORNIA INSURANCE CODE § 10369.12 APPLIES
## TO STONEBRIDGE'S ACCIDENTAL DEATH POLICY.

STONEBRIDGE argues that California Insurance Code § 10369.12 does not apply to its policy because Article V of Chapter 4 of the California Insurance Code, within which said section is found, applies only to group disability policies; that STONEBRIDGE'S policy form was approved by the California Insurance Commissioner; and, that the drug exclusion language found in STONEBRIDGE'S policy is not "less favorable" to the insured than that allowed by the statute.

### A.     THE APPLICATION OF § 10369.12
### IS NOT LIMITED TO GROUP INSURANCE.

STONEBRIDGE asserts that Insurance Code § 10369.12 does not apply to individual insurance.  It points to § 10270, entitled *Application of Chapter* in asserting that the chapter applies only to "group disability insurance."  STONEBRIDGE'S reliance on § 10270 for its assertion is unfounded.  Section (a) of § 10270 indicates that "this chapter shall not apply to workman's compensation insurance..." nor other delineated liability insurance.  Section (b) indicates that "this chapter shall apply to selected group disability insurance..." except as they are exempted under § 1040.1.  Nothing in § 10270 indicates that the chapter does not apply to individual disability policies or that it applies only to group disability policies.

Throughout the chapter there are various requirements and references for individual policies and for group policies.  If the chapter applied only to group policies there would not be reference to individual policy requirements.  As an example, § 10277 is entitled, *Dependency of Child over Limiting Age in Group Policy*.  § 10278 is entitled, *Dependency of Child over Limiting Age in Individual Policy*.  There are some provisions that apply only to group policies such as § 10273.4 regarding the renewal of group policies and others apply only to individual policies such as § 10273.6 regarding the eligibility for renewal of individual policies.  Other

1    provisions do not differentiate between group and individual policies.  The provisions referenced

2    by plaintiffs beginning at § 10369.1, entitled *Application of Article* are of this character.  Said

3    section specifically states:

4                No disability policy delivered or issued for delivery to any person in
             this state shall contain provisions respecting the matters set forth in
5            sections 10369.2 to 10369.12, inclusive, unless such provisions are
             in the words in which the same appear in such sections...."
6            (emphasis added).

7            These provisions apply both to group and individual policies.  To assume that the

8    Legislature meant otherwise is to read limitations within the statutory language that they do not

9    contain.

10            Defendant's assertion that Chapter 4 of the California Insurance Code, entitled *Standard*

11   *Provisions in Disability Policies* applies only to group policies has no foundation.  To assert so

12   would leave individual policies virtually unregulated.  Clearly, that is not the case or intent of the

13   Legislature.  In fact California courts have applied the relevant sections to individual policies.

14   (Olson v. American Bankers Insurance Co., 30 Cal.App.4th 816 (1994); Twohey v. Lincoln

15   National Life Insurance Co., 273 F.3d 817 (9th Cir. 2001) wherein the court held that California

16   Insurance Code § 10369.6 applies only to individual policies and not to group policies).

17

18   **B.      § 10369.12 APPLIES TO THE POLICY REGARDLESS OF WHETHER
             THE COMMISSIONER APPROVED THE POLICY FORM.**

19

20   California Insurance Code § 10369.1 provides as follows:

21           ... no disability policy delivered or issued for delivery to any person
             in this state shall contain provisions respecting the matters set forth
22           in sections 10369.2 to 10369.12, inclusive, unless such provisions
             are in the words in which the same appear in such sections;
23           provided, however, that the insurer may, at its option, use in lieu of
             any such provision a corresponding provision of different wording
24           approved by the commissioner, which is not less favorable in any
             respect to the insured or the beneficiary.  (emphasis added).

25

26           Every policy of disability insurance must be filed and approved by the insurance

27   commissioner (California Insurance Code § 10290).  The fact that the form of the policy has been

28

approved by the Insurance Commissioner's office does not allow an insurance company to enforce a provision which is contrary to California statute. The statute clearly states this fact when it provides a two-step process for the use of language not identical to that set forth in the statute. The first step is to be approved by the Commissioner and the second step is that the language must not be "less favorable in any respect to the insured or the beneficiary." The California courts have acknowledged these dual requirements for an insurer to use language other than as set forth in the statute. (Olson v. American Bankers Insurance Co., 30 Cal.App.4th 816, 827-828 (1994))[1]. Thus, assuming the Insurance Commissioner did approve the form the true question is whether the language in the policy is less favorable than that required by statute.

## C.     THE POLICY DRUG EXCLUSION IS LESS FAVORABLE THAN THAT ALLOWED BY STATUTE.

California Insurance Code § 10369.12 allows an insurer to exclude loss sustained as a consequence of the insured being under the influence of a controlled substance "*unless administered on the advice of a physician.*" The STONEBRIDGE policy excluded loss resulting from the taking of a drug "*unless taken or used as prescribed by a physician.*" The statutory language "*unless administered on the advice of a physician*" and the policy language "*as prescribed by a physician*" have been interpreted by the courts as having differing meanings. The courts that have looked at both phraseologies have held that the policy language is more restrictive than that allowed by statute in that it excludes a loss caused by an overdose of drugs prescribed by a physician if the medication was not used exactly as prescribed by the physician. Whereas the statutory language "*administered on the advice of a physician*" would not exclude a loss caused by the use of prescription medication whether it was taken exactly as prescribed or not. It has been said that the limitation is intended to exclude losses caused only by the illicit use

---

[1]    See Holloway v. J.C. Penney Life Insurance Co. 190 F.3d 838 (7th Cir. 1999) in which Stonebridge's predecessor unsuccessfully made the same argument that the commissioner's approval of the policy form allows enforcement of exclusions that do not conform to statute.

of intoxicants.  (Hummel v. Continental Casualty Insurance Co. 254 F.Supp.2d 1183, 1189

(D.Nev. 2003); Legare v. Canada Life Assurance Co. Southern District of California Case

Number 02 CV 0798, Stennett Declaration Exhibit 3).

Defendant cites an unpublished opinion from the Sixth Circuit applying Ohio law.  (Dice v.

General Electric Capital Assurance Co. 93 F. Apx. 68 (6th Cir. 2004)).  Though the court's order

in Dice concluded that a loss caused by the taking of drugs "*unless administered on the advice of*

*a physician*" would exclude a loss caused by the taking of medication in excess of the amount

specifically prescribed, the court in issuing its order clearly did not anticipate that its opinion

would be cited as precedent. This is clear from the fact that the order is a very cursory one-page

opinion that provides very little analysis.  Furthermore, the finding it made was dicta in that the

insured's death was caused by "acute multiple drug intoxication" that included Oxycodone and

Cocaine.  Since death was caused by a combination of Oxycodone and Cocaine and since Cocaine

is not a prescribed drug, then clearly the death would have been excluded by the drug exclusion.

Thus, it was not necessary for the court to discuss whether decedent's taking of more than the

prescribed amount of Oxycodone fell within the exclusion.  In contrast, the court in Hummel v.

Continental Casualty Insurance Co., supra, beginning on page 1189 goes to an in depth analysis of

the legislative purpose behind the Nevada statute which is identical to California Insurance Code §

10369.12 and then concludes:

> In light of the policy behind the statute, and the possibilities
> relating to the definition of "administered on the advice of," the
> Court finds that the Plaintiff's interpretation of 'administered on the
> advice of' parallels what the Legislature intended in enacting the
> statute.  'Taken as prescribed by' is a much stricter standard than
> 'administered on the advice of;' it requires exact adherence to the
> instructed dosages, whereas 'administered on the advice of' does
> not.  This interpretation of the clause 'administered on the advice
> of' is more in line with the policy behind the statute, namely,
> protecting insureds.  Nor does it achieve the absurd results that
> Continental asserts, specifically, that Nevada's insurance law would
> allow an insured to take unlimited quantities of prescribed
> medications and still be afforded coverage under the policy as
> insurance companies are not without means to protec themselves
> from risks arising from intentional overdoses.  Moreover, contrary
> to Continental's position, it is the clause 'taken as prescribed by'
> that could very well lead to absurd results.  For instance, if Erica
> had taken three Oxycodone pills in one day as opposed to two, and

suffered some unforseen negative reaction resulting from the additional medication, which in turn resulted in injury or loss, Continental would be free to deny her coverage based on her failure to adhere strictly to her physicians instructions.  Continental's ability to deny coverage under such circumstances would thwart the public policy of protecting insureds against overreaching insurance companies and lead to truly absurd results.

It is more reasonable to assume that the purpose of the statute's language was to prevent the exclusion from applying in cases where the consumption of the drug or narcotic was itself an illegal act.  Accordingly, the Court finds the reasonable and appropriate construction of the term 'administered on the advice of' to include Erica's situation where her physician gave her a prescription of Oxycodone to relieve her migraines.  Ibid page 1190.


## II.

### THE POLICY'S MEDICAL TREATMENT CLAUSE DOES NOT EXCLUDE PLAINTIFFS' LOSS

### A.    MEDICAL TREATMENT WAS NOT THE EFFICIENT PROXIMATE CAUSE OF DECEDENT'S DEATH.

Where there are multiple factors contributing to the cause of loss the modern test is to determine whether the "efficient proximate cause" of the loss was covered under the policy. (Garvey v. State Farm Fire & Cas. Co. 48 Cal.3d 395, 412 (1989)).  Most accidental death policy exclusions are written so that death is excluded if "contributed to by" disease or treatment thereof.  Despite this language, the modern California courts uniformly disregard such limiting language in policies as contrary to California public policy and apply the efficient proximate cause analysis.  (Bornstein v. J.C. Penney Life Insurance Co. 946 F.Supp. 814, 819 (C.D. Cal. 1996); Arata v. California Western States Life Insurance Co. 50 Cal.App.3d 821, 825 (1975) - hemophiliac died of uncontrollable bleeding following accident; accidental death benefits payable despite policy provision excluding deaths "contributed to by ... disease or bodily or mental infirmity.")

It is important to note the above modern California approach to applying insurance exclusions when looking at the authority cited by defendant.  Defendant's page and a half

discussion of the medical treatment exclusion (page 8-9 of defendant's points and authorities)
cites five cases. None of the cases apply California law; the cases were all decided between 1877
and 1950; each of the cases dealt with accidental means policies rather than accidental death
policies; and each of the policies excluded death caused by disease or treatment thereof even if the
disease or treatment was only a "partial" or "contributing" cause. (Wilson v. Businessmen's
Assur. Co. of America 181 F.2d 88, 89 (9th Cir. 1950) - applying Idaho law excluded death
"caused wholly or partly, the results of which are contributed to by bodily or mental infirmity,
hernia or any medical or surgical treatment therefor;" Barkerding v. Aetna Life Insurance Co. 82
F.2d 358 (5th Cir. 1936) - excluded death "caused directly or indirectly, wholly or partly, by
bacterial infections;" Bayless v. Travelers Insurance Co. 2 F.Cas. 1077 (E.D.N.Y. 1877) -
excluding death "caused wholly or in part by any surgical operation or medical or mechanical
treatment for disease;" New Amsterdam Casualty Company of Perryman 162 Miss. 864 (1932) -
excluded disability "caused directly or indirectly by a medical or surgical treatment.") (Emphasis
added).

Contrasting authority cited by defendant are those cited by plaintiffs in their points and
authorities in support of partial summary judgment beginning on page 10. Each of the cases cited
by plaintiffs are current (post 1996), apply California law and deal with accidental death as
opposed to accidental means policies.

Ms. Hall-Hussain's death was not caused by her medical treatment. Rather, her death was
caused by the accidental toxic overdose of medication which caused an injury to her system and
subsequent death. In this case there is an independent act similar to the medical malpractice cited
by the court in Heighley v. J.C. Penney Life Insurance Co. 257 F.Supp.2d 1241 (C.D.Cal 2003).
In this case, that independent act was the unintended toxic overdose that directly resulted in
death.

**B.    THE MEDICAL TREATMENT EXCLUSION AS APPLIED BY STONEBRIDGE IS VIOLATIVE OF THE CALIFORNIA INSURANCE CODE.**

The final differentiation between the cases cited by defendant and the cases cited by plaintiffs on this issue is that none of the cases cited by defendant dealt with a statutory limitation on exclusions that may be included within a policy.  California Insurance Code § 10369.1 specifically states that <u>no disability policy</u>

> "shall contain provisions <u>respecting the matters set forth in sections 10369.2 to 10369.12</u>, inclusive, unless such provisions are in the words in which the same appear in such sections; provided, however, that the insurer may ...[use other language]... which is not less favorable in any respect to the insured." (Emphasis added).

As previously stated, the State Legislature has addressed in § 10369.12 the maximum extent an insurer can limit coverage for accidental loss caused by the use of intoxicants.  Coverage for accidental losses caused by the use of <u>prescribed</u> medication cannot be limited.  The California Legislature in enacting § 10369.12 anticipated accidental death being caused by prescribed medication and has precluded limiting such loss.

STONEBRIDGE'S effort to interpret its "disease and treatment thereof" exclusion to exclude accidental death caused by use of prescribed medication is violative of §§ 10369.1 and 10369.12.

**C.    HOW MUCH OXYCODONE WAS TAKEN BY MS. HALL-HUSSAIN?**

STONEBRIDGE, in its points and authorities argues that it is undisputed that Ms. Hall-Hussain took "nearly double the prescribed amount" of Oxycodone.  (STONEBRIDGE'S Points and Authorities, page 6).  This conclusion was based on defendant's simple arithmetic based on the number of pills found by the Coroner with the prescription bottle dated March 27, 2007.  However, defendant's assertion is inconsistent with the facts set forth in the Declaration of Michele Smith Fregoso and STONEBRIDGE'S own toxicologist report.

Ms. Hall-Hussain's daughter, MICHELE SMITH FREGOSO, stated that after her

1 mother's death she obtained her mother's handbag with her pill organizer that contained her

2 medication for one week. She also indicated that her mother had a habit of keeping medications

3 in various areas of her apartment. Thus, a simple counting of the number of pills remaining in the

4 bottle is not an accurate methodology for determining how many pills had been taken by Ms. Hall-

5 Hussain from the March 27, 2007 prescription bottle.

6 STONEBRIDGE during its initial investigation of the claim retained the services of a

7 forensic toxicologist Gary H. Wimbish, Ph.D. He submitted a report to STONEBRIDGE dated

8 June 7, 2007. In his report he stated:

9 > With current therapy at 40 mg. [1 pill] per dose every 8 hours, the
> blood concentration would be expected to plateau at about 0.06
10 > mg/L. (Casino Declaration, Exhibit 2, pg 2).

11 As STONEBRIDGE acknowledges, Dr. Chen increased Ms. Hall-Hussain's dosage on

12 April 3, 2007 (five days before her death) to three 40 mg pills every 8 hours. (UF No. 16). Thus,

13 Gary Wimbish's figure should be multiplied by a factor of three which would have given Ms. Hall-

14 Hussain an "expected plateau" at about .18 mg/L. This is slightly less than the 0.25 mg/L blood

15 concentration of Oxycodone found in Ms. Hall-Hussain's blood following her death, not "nearly

16 double the prescribed amount" asserted by defendant.

17 The above values are mere estimates since there are numerous elements that may affect

18 the blood concentration values. In fact Dr. Chen testified that it may be that Ms. Hall-Hussain did

19 not take more than what was prescribed. Dr. Chen testified that her higher level of blood

20 concentration could be attributable to an inability to metabolize and eliminate the higher dosage of

21 Oxycodone, resulting in a build up in her blood above the expected values. (Casino Declaration

22 Exhibit 1, pg 55:1-12).

23

24 **III.**

25 **CONCLUSION**

26 Defendant has failed to establish the applicability of the two exclusions upon which it

27 relied to deny coverage. Additionally, both the drug exclusion and the medical treatment

28

exclusion, as defendant interprets their application to this case, are violative of the California

Insurance Code.

Respectfully submitted

STENNETT/CASINO
Attorneys for Plaintiffs


By    /s/      *John P. Stennett*
                JOHN P. STENNETT

**SMITH v. STONEBRIDGE LIFE INSURANCE COMPANY**

U.S. DISTRICT COURT
CIVIL ACTION NO. C 08-01466 JCS

**DECLARATION OF SERVICE BY ELECTRONIC FILING**

I, the undersigned declare:

That I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action; and I am employed in the County of San Diego, State of California, at the law offices of Stennett & Stennett in which county the within mentioned mailing occurred.  My business address is 501 W. Broadway, Suite 1340, San Diego, CA 92101.

On August 29, 2008,  I served the following documents:  PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; DECLARATION OF BARBARA A. CASINO IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

on the following named person by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

MANATT, PHELPS & PHILLIPS
MARGARET LEVY
JOSEPH E. LASKA
11355 West Olympic Boulevard
Los Angeles, CA 90064
(mlevy@manatt.com; jlaska@manatt.com)
Attorneys for Defendants

BY ELECTRONIC FILING & SERVICE VIA CM/ECF: I transmitted a true copy of the above-entitled document to CM/ECF on August 29, 2008.  I caused all of the above-entitled documents to be sent to the recipients noted via CM/ECF Filing Receipt page will be maintained with the original documents in our office.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 29, 2008, at San Diego, California.

/s/ *JOHN P. STENNETT*
JOHN P. STENNETT
sc@stennettcasino.com

John P. Stennett, SBN: 72815
Barbara A. Casino, SBN: 91952
**STENNETT/CASINO**
Attorneys at Law
501 W. Broadway, Suite 1340
San Diego, California 92101
(619) 544-6404
(619) 233-3796 (FAX)
(**SC@StennettCasino.com;**
BCasino@StennettCasino.com)

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRI SMITH and MICHELE SMITH FREGOSO, <br><br> Plaintiffs, <br><br> v. <br><br> STONEBRIDGE LIFE INSURANCE COMPANY, <br><br> Defendant. | Case No.  C:08-01466 (JCS) <br><br> DECLARATION OF BARBARA A. CASINO IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT <br><br> U.S. Magistrate Judge Joseph C. Spero <br><br> DATE:     September 26, 2008 <br> TIME:     9:30 a.m. <br> CTRM:    A |

I, BARBARA A. CASINO declare as follows:

1.      I am an attorney licensed to practice before the courts of the State of California and this Court.  I am the attorney of record for plaintiffs in the within action.  I have personal knowledge of the facts set forth in this declaration except those matters stated on information and belief which I believe to be true.  If called as a witness I can and will testify competently to all those facts.

1    2.    Attached as **EXHIBIT 1** are true and correct copies of excerpts from the

2          Deposition Transcript of Chia Chen, M.D. taken April 11, 2008.

3

4    3.    Attached as **EXHIBIT 2** is a true and correct copy of a June 7, 2007 report of

5          Gary H. Wimbish, Ph.D. addressed to Stonebridge Life Insurance Co.  The report

6          was contained in Stonebridge Life Insurance Company's claim file.

7

8    I declare under penalty of perjury under the laws of the United States of America that the

9    foregoing is true and correct and that this declaration was executed on August 29, 2008

10

11    _____

12    BARBARA A. CASINO

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CASE NO. C 08-01466 JCS

.   .   .


TERRI SMITH and MICHELLE
SMITH FREGOSO,

            Plaintiffs,

     vs.

STONEBRIDGE LIFE INSURANCE
COMPANY,

            Defendants.

_____/


D E P O S I T I O N

O F

CHIA CHEN, M.D.

.   .   .

FRIDAY, APRIL 11, 2008

.   .   .

8:15 A.M.

.   .   .


VALERIE WALKER, CSR #7209

**CRNICH DEPOSITIONS**
626 H STREET, EUREKA, CA. 95501
TELEPHONE 707 443-4879
FAX 707 443 4870
CONFERENCE ROOMS

1    that conversation that you had recently increased her

2    dosage on her OxyContin?

3        A.  I very well may have because I would have the

4    notes in front of me, so chances are I would have given

5    him some information from my notes, and that may very

6    well include an increased dose.

7        Q.  You testified that your initial thought was that

8    maybe she overdosed on her OxyContin?

9        A.  She could, yeah.

10       Q.  Did you have any reason to believe that she might

11   have done that?  What was it that made you wonder --

12   that made you identify that as a possible reason for her

13   death?

14       A.  It would be -- it would have been a possible

15   reason for any patient that's on pain medication, this

16   type of pain medication.  That's one of the things we

17   always have to think about, if they pass away and

18   they're on narcotic pain medication.  So it's not

19   specific to her; it's specific to her type of patient,

20   that she's a pain patient, she's on pain medication.

21   She's been prescribed pain medication.  So that would be

22   why I would think about that.

23       Q.  And when you say that you thought that perhaps

24   she had overdosed, by that you mean had taken more

25   medication than you had prescribed for her?

1    A.   Yes.  Overdose could mean that she had taken more

2    than prescribed, or that the more amount -- her body

3    cannot handle the increased amount due to a change in

4    some other condition.  For instance, your medication is

5    normally metabolized by all your body organs.  So if

6    there was some change in your medical status that you

7    couldn't metabolize the medication, even if you're

8    taking the prescribed amount, you may not be excreting

9    them as you normally would.  Then they could build up in

10    your system.  And that is an overdose too because that

11    means that there's more of that in your system than your

12    system can handle.  So that could be considered as well.

13    Q.   During your telephone call with the coroner, did

14    he provide you with any information as to the number of

15    pills that he believed Ms. Hall-Hussain had taken in the

16    days leading up to her death?

17    A.   If he did, I didn't write it down.  I don't know

18    if he did or not.

19    Q.   Do you have any record of your conversation with

20    the coroner, other than this note here that you called

21    him?

22    A.   No.  Does the coroner have a record?  Maybe

23    they --

24    Q.   They do.  And actually, that was going to be my

25    next question.

# EXHIBIT 2

06/07/2007  10:03    8173772054                                    PAGE  02/05





**FORENSIC TOXICOLOGY CONSULTANTS, INC.**
Gary H. Wimbish Ph.D., DABFT
Diplomate American Board of Forensic Toxicology

June 7, 2007

Ms. Judy Lovelady, ALHC
STONEBRIDGE LIFE INSURANCE CO.
2700 W. Plano Pkwy
Plano, TX  75075-6367

    Re:   Insured:    Diane G. Hall-Hussain
         Claim #:     B-651853

Dear Ms. Lovelady:

    I received via facsimile transmission on June 4, 2007, copies of the Proof of Accidental Death-Affidavit of Claimant, Certificate of Death, County Humbolt, Eureka, California, records from Lima's Professional Pharmacy, Eureka, California, Coroner's Death Investigation Report, Central Valley Toxicology Report, Claim Progress Sheet, Redwood Family Practice records and medical records from Chia Chen, M.D. and John Gambin, M.D. concerning Ms. Hussain.

    Review of these records reveals that on April 9, 2007 at about 11:15 hours, Ms. Hussain was found by her brother in a sitting position by her bed.  The Coroner's office was called and she was pronounced dead shortly thereafter.  Roy Horton, Deputy Coroner, drew blood from the deceased at the Coroner's office.  The blood was sent to Central Valley Toxicology for a complete drug screen.  The results are shown below:

| SAMPLE | RESULT |
|---|---|
| Blood: | |
|   Amitriptyline | 0.27 mg/L |
|   Nortriptyline (metabolite of amitriptyline) | 0.08 mg/L |
|   Oxycodone | 0.25 mg/L |
|   Oxymorphone (metabolite of oxycodone) | 0.05 mg/L |
|   Temazepam | 0.05 mg/L |
|   Metoclopramide | 0.02 mg/L |
|   Trimethoprim | 0.16 mg/L |

    Amitriptyline is a tricyclic antidepressant available in doses from 10 to 150 mg.  It is metabolized to nortriptyline.  The concentration of amitriptyline and nortriptyline of 0.27 and 0.08 mg/L respectively are in the expected therapeutic range.

Ms. Judy Lovelady, ALHC
June 7, 2007
Page 2

Oxycodone is a narcotic analgesic used for the treatment of chronic pain.  Ms. Hussain received 40 mg of oxycodone, a sustained release formulation of oxycodone from Dr. Chen.  Dr. Chen had recently increased her dose to one 40 mg tablet every 8 hours (3x/day) rather than the recommended every 12 hours because the previous amount was no longer effective. A single dose of 40 mg oxycontin will produce a peak blood value of about 0.039 mg/L. (1) With current therapy at 40 mg per dose every 8 hours, the blood concentration would be expected to plateau at about 0.06 mg/L.  The blood value for oxycodone found at autopsy was 0.25 mg/L.  Post mortem blood concentrations associated with death range from 0.4 to 2.7 mg/L. (2)  Death has been associated with blood values as low as 0.1 mg/L, but only if the subject is naïve to the effects of oxycodone and/or other CNS depressant drugs are present. (3)

Temazepam is a hypnotic drug intended for oral administration on a once-nightly bases.  Ms. Hussain was prescribed 30 mg to be taken nightly.  Peak blood concentration achieved at about 1.4 hours after ingestion averaged 0.08 mg/L. (4) The value found in Ms. Hussain's blood at 0.05 mg/L is considered sub-therapeutic.

Metoclopramide and trimethoprim are not centrally acting drugs and most likely did not contribute to the cause of death.

Therefore, it cannot be said with any degree of scientific certainty that Ms. Hussain's death was directly related to an overdose of oxycontin.  However, the blood concentration of oxycontin is not consistent with the prescribed dosage regiment.  I must defer the cause of death to the Coroner of Humbolt County.

Thank you for the opportunity to be of service.

Yours sincerely,

Gary H. Wimbish PhD

Gary H. Wimbish, Ph.D., DABFT

GHW:jp
Attachment