1   MANATT, PHELPS & PHILLIPS, LLP
    MARGARET LEVY (Bar No. 66585)
2   JOSEPH E. LASKA (Bar No. 221055)
    11355 West Olympic Boulevard
3   Los Angeles, California  90064
    Telephone:  (310) 312-4000
4   Facsimile:  (310) 312-4224
    Email:  mlevy@manatt.com and jlaska@manatt.com
5
    *Attorneys for Defendant*
6   STONEBRIDGE LIFE INSURANCE COMPANY

7

8                  UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11 TERRI SMITH and MICHELE SMITH FREGOSO, | Case No. C 08-01466 JCS |
| 12 | Magistrate Judge Joseph C. Spero |
| 13 Plaintiffs, | DECLARATION OF JOSEPH E. LASKA IN SUPPORT OF |
| 14 vs. | DEFENDANT STONEBRIDGE LIFE INSURANCE COMPANY'S |
| 15 STONEBRIDGE LIFE INSURANCE COMPANY, | OPPOSITION TO PLAINTIFFS' PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST CAUSE OF |
| 16 Defendant. | ACTION FOR BREACH OF CONTRACT |
| 17 | |
| 18 | [Filed concurrently with: (1) Opposition to Plaintiffs' Motion for |
| 19 | Partial Summary Judgment; (2) Declaration of Cheryl Penner; |
| 20 | (3) Evidentiary Objections to Declaration of Michele Smith Fregoso; and |
| 21 | (4) Evidentiary Objections to |
| 22 | Declaration of John Stennett.] |
| 23 | Hearing Date:    September 26, 2008 |
| 24 | Hearing Time:    9:30 a.m. Courtroom:        A |
| 25 | Action Filed:    September 5, 2007 |

26

27

28

# DECLARATION OF JOSEPH E. LASKA

I, Joseph E. Laska, declare as follows:

1.    I am an attorney licensed to practice before the courts of the State of California and this Court. I am an associate with the law firm of Manatt, Phelps & Phillips, LLP, counsel for Defendant Stonebridge Life Insurance Company ("Stonebridge") in this action. I have personal knowledge of the facts set forth in this declaration, except those matters stated on information and belief, which I believe to be true. If called as a witness, I can and will testify competently to all of those facts.

2.    Attached as **Exhibit 1** are true and correct copies of excerpts from the transcript of the deposition of Dr. Chia Chen, taken on April 11, 2008.

3.    Attached as **Exhibit 2** are true and correct copies of excerpts from the transcript of the deposition of Humboldt County Deputy Coroner Roy Horton, taken on April 11, 2008.

4.    On August 14, 2008, I spoke with Plaintiffs' counsel John Stennett by telephone. I informed him that Plaintiffs' Motion for Partial Summary Judgment had not been filed by the August 13, 2008 deadline agreed by the parties and ordered by the Court. I did not receive service of Plaintiffs' Motion and supporting declarations through the Court's e-filing system until August 15, 2008.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed by me on August 29, 2008 in Los Angeles, California.

_____
Joseph E. Laska

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41313139.1                                    1

DECLARATION OF JOSEPH E. LASKA IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CASE NO. C 08-01466 JCS

TERRI SMITH and MICHELLE
SMITH FREGOSO,

           Plaintiffs,

   vs.

STONEBRIDGE LIFE INSURANCE
COMPANY,

           Defendants.

_____/

D E P O S I T I O N

O F

CHIA CHEN, M.D.

FRIDAY, APRIL 11, 2008

8:15 A.M.

VALERIE WALKER, CSR #7209

**CRNICH DEPOSITIONS**
626 H STREET, EUREKA, CA. 95501
TELEPHONE 707 443-4879
FAX 707 443 4870
CONFERENCE ROOMS

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4      Law Offices of Jack Stennett
        BY:   Jack Stennett, Esq.
 5                and
              Barbara Casino, Esq.
 6      501 West Broadway, Ste. 1340
        San Diego, CA   92101
 7      (619) 544-6887

 8      (Appearing telephonically)

 9

10   FOR THE DEFENDANTS:

11      MANATT, PHELPS & PHILLIPS, LLP
        BY: Joseph Laska, Esq.
12      11355 West olympic Boulevard
        Los Angeles, CA   90064
13      (310) 312-4352

14

15

16

17

18

19

20

21

22

23

24

25
```

2

```
 1                        I N D E X
 2
 3   EXAMINATION                              PAGE
 4     By Mr. Laska                          5, 72
 5     By Mr. Stennett                      66, 74
 6
 7
 8   EXHIBITS              DESCRIPTION        PAGE
 9     A            Medical records           21
10     B            April 9, 2007 notes       52
11     C            Death certificate         61
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CASE NO. C 08-01466 JCS

TERRI SMITH and MICHELLE
SMITH FREGOSO,

             Plaintiff,

    vs.

STONEBRIDGE LIFE INSURANCE
COMPANY,

             Defendants.

_____/

      Be it remembered that pursuant to notice, and on

Friday, April 11, 2008, commencing at the hour of

8:15 a.m. thereof, at the office of Redwood Family

Practice, 2350 Buhne Street, Eureka, California, before

me, Valerie Walker, Certified Shorthand Reporter Number

7209 for the State of California, personally appeared

             CHIA CHEN, M.D.,

a witness in the above-entitled action, called by the

Defendant, who, after having been duly sworn to testify

to the truth, the whole truth and nothing but the truth,

was interrogated and examined in said cause.

4

1        EUREKA, CALIFORNIA; FRIDAY, APRIL 11, 2008

2              8:15 A.M.

3

4

5           CHIA CHEN, M.D.,

6     having been duly sworn, testified as follows:

7

8             EXAMINATION

9  BY MR. LASKA:

10    Q.  Good morning, Dr. Chen.

11    A.  Good morning.

12    Q.  Could you please state your name for the record?

13    A.  Chia Chen.

14    Q.  Have you ever been known by any other names?

15    A.  No.

16    Q.  Okay.  Do you have a maiden name?

17    A.  I have a middle name, L-I-N.

18    Q.  L-I-N?

19    A.  Yes.

20    Q.  As I said, I introduced myself earlier, but for

21 the record, Joe Laska.  I'm an attorney, and I represent

22 Stonebridge Life Insurance Company in connection with

23 the litigation that was filled by Terri Smith and

24 Michelle Smith Fregoso, who were daughters of Diane

25 Geraldine Hall-Hussain, who I understand was your former

5

1    another office and decided to come back here.

2        Q.   What was the name of the previous physician from

3    this office that she had seen?

4        A.   I believe -- I don't have a name here on my

5    record, but I believe it was Eureka Internal Medicine,

6    although she had several because of all the specialists

7    she'd been going to, so I'm not surprised that I didn't

8    write that particular physician down.  But on my records

9    it was Dr. Albertini, A-L-B-E-R-T-I-N-I, who was the

10   urologist, kidney specialist.  But you could say that

11   was the last one she saw.

12        Dr. Albertini was a doctor she saw here, not in

13   this office, in this town.

14        Q.   Okay.  I see.  Sorry.  I may have misunderstood.

15   I believe you testified she continued her treatment with

16   a different doctor here in this office?

17        A.   Right.  In 1999 she saw a different physician, a

18   primary physician, and she was not seen in our office

19   until I saw her in 2004.  So between those times she had

20   seen other physicians, including other primary

21   physicians and specialists.

22        Q.   What was the name of the primary physician from

23   this office that she saw in 1999?

24        A.   That was Dr. Newman, N-E-W-M-A-N.

25        Q.   Were you Ms. Hall-Hussain's primary physician

18

7

1   from July 7th, 2004 --

2        A.   Yes.

3        Q.   -- through the time of her death?

4        A.   Yes.

5        Q.   To your knowledge, did Ms. Hall-Hussain see any

6   other doctors during that period?

7        A.   Yes, specialists and also any doctor that might

8   have consulted while she was hospitalized, but I don't

9   believe she's seen any other primary doctors.

10       Q.   Do you know Dr. Ann Lindsay?

11       A.   Yes.

12       Q.   Do you know if Ms. Hall-Hussain was a patient of

13   Dr. Lindsay's?

14       A.   Not from this record in front of me, but I could

15   search through it more, if you like.  She might.  She's

16   been in this area for a while so she might have seen

17   other physicians in the area that I'm not aware of.

18       Q.   Dr. Lindsay doesn't work in this office, correct?

19       A.   No.

20       Q.   But have you no personal knowledge of

21   Ms. Hall-Hussain seeing Dr. Lindsay?

22       A.   That could be the doctor she'd seen before.  I

23   recall she said that she was fired by another physician,

24   and that might be -- it was -- or maybe she fired her.

25            But anyway, so she was on a medication called

19

1    A.   Yes.

2    Q.   Do you remember the first time that you

3    prescribed it for her?

4    A.   No, I don't remember the dates.

5    Q.   We can walk through the records and try to figure

6    that out.  But what was the reason that you prescribed

7    the oxycodone for Ms. Hall-Hussain?

8    A.   For intractable pain.

9    Q.   And you prescribed the OxyContin to treat the

10    intractable pain?

11    A.   Right.  I have the date if you like, April 21st,

12    2005.

13    Q.   To keep the record clean, why don't we look at

14    the stack of documents that I gave to you, and I'll

15    point out where I believe that is.  If you would notice

16    at the bottom of each page there's a number that says

17    SLIC, and if you could turn to the page that is 129.

18    A.   Okay.

19    Q.   Is that the record that you were looking at in

20    your file?

21    A.   Yes.

22    Q.   And based on this record, it's your recollection

23    that you first prescribed OxyContin for Ms. Hall-Hussain

24    on April 21st, 2005?

25    A.   Yes.

24

1  her to oral morphine.

2     Q.  What is a Duragesic patch?

3     A.  A Duragesic patch is a narcotic pain medication

4  that is taken not by mouth but through a patch that you

5  place on the skin, and the patch is stuck to the skin

6  for, could be three days in a row, and the medication is

7  released slowly and absorbed by the skin.

8     Q.  And you're testifying, based on your notes, that

9  you had switched Ms. Hall-Hussain from the patch to oral

10 morphine?

11    A.  Yes.

12    Q.  Do you recall the reason for the change?

13    A.  Let's see if I can see from this.  It's either

14 she did not tolerate the adhesive or that the patch is

15 not working.  And from my notes down at the bottom, it

16 looks like I had written for her to increase the patch.

17 So it might be that she complained that the patch is not

18 working for her pain.  So I thought oral morphine might

19 be different in which she might adjust the dose more

20 easily, so we wanted to give her a trial of the MS

21 Contin.

22    Q.  And ultimately you, based on your testimony, on

23 April 21st ended up prescribing OxyContin for her?

24    A.  Right.

25    Q.  You testified OxyContin is a narcotic painkiller?

31

1    A.   Yes.

2    Q.   So is it safe to say there are certain risks

3    associated with taking the drug?

4    A.   Yes.  With all three that I mentioned, they are

5    narcotic painkillers, and there are risks for taking all

6    those.

7    Q.   What are some of the risks?

8    A.   You could be overly sedated.  You could have the

9    known side effects of any medication.  You could have

10   adverse reactions.  You could overdose on the

11   medication, if you weren't careful, or if you combine

12   with other central nervous system stimulants or

13   depressants, they could enhance the effect of the

14   medication.

15   Q.   Can you give me examples of some central nervous

16   system depressants?

17   A.   Could be -- alcohol is very common, or other

18   medications, or any illegal or legal medications.

19   Q.   So, for example, if a patient consumed alcohol

20   while taking OxyContin, that could increase the sedative

21   effects?

22   A.   Correct.

23   Q.   And increase the risk of overdose?

24   A.   Yes.

25   Q.   Did you describe or discuss any of these risks

32

11

1  with Ms. Hall-Hussain at the time that you prescribed

2  the OxyContin?

3      A.   Yes.   I make it a normal practice every time

4  there's a new medication prescribed, we always --

5  especially a narcotic or a central nervous system

6  medication that could affect the nervous system, we

7  always would use that precaution:   Do not use alcohol or

8  any similar medication without my okay.

9      Q.   And did you similarly describe the risk of

10  overdose to Ms. Hall-Hussain, to the best of your

11  recollection?

12      A.   At some point I have talked to her about -- the

13  reason that we write the doses down precisely and give

14  precise numbers and control the way we write the

15  prescription -- at that time I believe it was triplicate

16  prescription forms -- is for that very purpose.   The

17  fact that it's treated differently than a regular

18  medication, say an antibiotic is, because of all these

19  inherent risks.   So I believe she came to me, could be

20  already on -- yes, she was already on medication,

21  narcotics.   She had experience with narcotics medication

22  before.

23          So it may not be that every time I see her --

24  every time I mention a narcotic I would go over the

25  entire risk profile again, but I'm sure it has been

33

1    mentioned.  And I'm sure the sense that this is a

2    controlled substance that we have to use it very

3    carefully has been described to her.

4       Q.  So it's fair to say that you would have discussed

5    that with her at some point from April 21st on?

6       A.  From the first time I've seen her.

7       Q.  And you testified that she was on -- she had

8    previous experience with narcotics; is that what you

9    said?

10      A.  I believe she has, yeah.

11      Q.  Are you basing that belief on -- do you have an

12   independent recollection of that, or are you basing that

13   on some notations in your records?

14      A.  I think I have old records I can look at.

15          Well, she had already been on Neurontin even back

16   in 1999 when she saw Dr. Newman.  So that is a chronic

17   pain medication that we tend to use for people with

18   chronic pain.

19      Q.  And the name of that drug was Neurontin?

20      A.  Yes.  And she was on Tylenol No. 3.  This was

21   back in 1999.  So she had already had experience with

22   narcotic medications even when she was seen back in 1999

23   by another doctor here.

24      Q.  And nevertheless, at the time that you prescribed

25   the OxyContin to Ms. Hall-Hussain it would have been

34

13

1  your practice to discuss the possible dangers of the

2  drug and the possible side effects?

3     A.   Yes.

4     Q.   Do you have any recollection of whether

5  Ms. Hall-Hussain indicated to you an understanding of

6  what you discussed of the risks of taking the drug?

7     A.   Yes.

8     Q.   You do have a recollection of that?

9     A.   Yes.

10    Q.   Can you describe to me what it is that you recall

11 exactly?  Was it an in-person discussion that you had?

12 Was it during this telephone call?

13    A.   It wasn't during the telephone call because if we

14 expressly talked about that, I would have written it

15 down.  It's probably some other visit, a face-to-face

16 visit that we've had, or hospital visit that we had.

17 And when we talked about pain medication -- or pain

18 control, pain management, and when changes or increases

19 come up, that's when we would discuss it.

20    Q.   So you don't recall exactly the date of this

21 conversation or when it was during your treatment of

22 her?

23    A.   No.  Because it would be numerous times.

24    Q.   So you do have an independent recollection or

25 independent recollections of discussing these risks with

35

14

1    Ms. Hall-Hussain and of her communicating to you that

2    she understood the risks?

3       A.   Yes.

4       Q.   Do you have any recollection of instructing

5    Ms. Hall-Hussain not to increase the dosage of the

6    medicine without your consent?

7       A.   Yes.

8       Q.   For instance, you would tell her that she

9    shouldn't just -- if she's feeling in pain she shouldn't

10   just take more of the medicine without first consulting

11   with you?

12      A.   If I wanted her to independently titrate the

13   medication, I would tell her so, and I would give her an

14   upper limit.  And the upper limit would be implicit in

15   my prescription itself, and also the number of pills and

16   the amount of time I expect the pills to last.  And

17   that's always the case for any narcotic medication with

18   anyone.

19      Q.   So I want to make sure I understand your

20   testimony then.  Your testimony is that the prescription

21   you wrote would be the upper limit of what you were

22   instructing her to take?

23      A.   Yes.

24      Q.   With the understanding that she could always take

25   less medicine if she --

36

1    A.   Don't need them.

2    Q.   Right.  But that she was not supposed to take

3    more medicine than you had prescribed?

4    A.   Correct.

5    Q.   And you have recollections of talking with

6    Ms. Hall-Hussain about this?

7    A.   Yes.

8    Q.   And of her indicating to you that she understood

9    it?

10   A.   Yes.

11   Q.   Let's go back to page 129.  I just want to walk

12   through the dosages here.  Under the April 21st entry,

13   there's an entry that appears to be dated May 24th,

14   2005.  Please tell me if I'm not reading this correctly.

15   This seems to indicate to me that you've increased the

16   dosage of OxyContin 40 milligrams to two pills two times

17   a day?

18   A.   Yes.

19   Q.   And you increased the number of pills to 120?

20   A.   Yes.

21   Q.   And that was because two pills twice a day is

22   four pills a day?

23   A.   Correct.

24   Q.   Times 30 days is 120?

25   A.   Yes.

37

1    appears to be a note from November 3rd, 2006?

2        A.   Yes.

3        Q.   At the bottom it seems to indicate that

4    Ms. Hall-Hussain is -- or was still instructed to take

5    40 milligrams of OxyContin, two pills three times a day?

6        A.   Yes.

7        Q.   So that was the same dosage as last time?

8        A.   Yes.

9        Q.   And it was not an increase?

10       A.   Yes.

11       Q.   Okay.  Let me ask you -- we have, based on the

12   notes that we've looked at, seems like Ms. Hall-Hussain

13   was on OxyContin from April 2005, starting in April

14   2005?

15       A.   Yes.

16       Q.   To your knowledge, was she taking OxyContin from

17   April 2005 up through the time of her death?

18       A.   Yes.  It should be.

19       Q.   I mean, you don't have any recollection that she

20   had stopped taking it at any point and then started

21   taking it again?

22       A.   I would have to look through the records to see

23   if she told me she stopped and started.  If the refill

24   record shows that every month we've been refilling it,

25   then I'd have to assume she was taking it or she

42

1   wouldn't be filing for a refill.

2      Q.   Let's discuss that process.

3           The number of pills that you prescribed for

4   Ms. Hall-Hussain was intended to last 30 days?

5      A.   Yes.

6      Q.   So one month supply?

7      A.   Yes.

8      Q.   So did she refill her prescription every month?

9      A.   I can look and tell you.  Do you want me to look

10  and tell you?

11     Q.   Yes, please.  And I think the notes you're

12  looking for are probably at 134, and there's some

13  additional notes on 135 and 136.

14     A.   So it looks like it's very close to monthly, yes,

15  because you can see every·month, April, May, June, July,

16  August, so forth.

17     Q.   How did that work logistically?  Did Ms. Hall

18  have to come in every month personally for the

19  prescription?  Was it something that you were able to

20  telephone into the pharmacy?

21     A.   Yeah.  The way we do it is, if a person has had a

22  long experience with the medication, I feel that they

23  are -- they don't need to come in every month.  They can

24  come in every three months.  Or if I feel that they do

25  need to come in every month, I will make them come in

43

1    A.  Exactly.

2    Q.  Because of all the dangers involved?

3    A.  Yes.

4    Q.  And the next time you prescribed the medication

5  was March 26?

6    A.  Yes.

7    Q.  If I could direct your attention to page 112, to

8  the second to last page from the top.  Is this your

9  handwriting?

10    A.  No.  This is a student, a nursing -- well, a

11  nurse practitioner student.

12            MR. STENNETT:  When you say "this," are you

13  referring to the Post-it note?

14            MR. LASKA:  I'm sorry.  We're looking at

15  112, and it's just a whole sheet of notes.  And I was

16  referring to the handwriting in general.

17            MR. STENNETT:  Okay.

18  BY MR. LASKA:

19    Q.  It appears to be dated April 3rd, 2007?

20    A.  Yes.

21    Q.  The middle of the page, based on what we

22  discussed earlier, it appears to indicate that you

23  increased the dosage of OxyContin to 40 milligrams three

24  tabs three times per day?

25    A.  Yes.

48

19

1    Q.    And the number next to that is 270?

2    A.    Yes.

3    Q.    And that's because three tabs three times a day

4    is nine tabs per day times 30 days is 270?

5    A.    Uh-huh.  Yes.

6    Q.    So based on these notes, it's your recollection

7    that this is accurate in that on April 3rd you increased

8    the dosage of Ms. Hall-Hussain's OxyContin?

9    A.    Yes.

10    Q.    Do you have any independent recollection of this

11    office visit?

12    A.    Yes.

13    Q.    Do you remember why it was that you increased the

14    dosage at that time?

15    A.    It's because she complained of more pain, and her

16    pain is not being controlled by what she's on.  And she

17    might have expressed to me that -- she stopped the

18    existing medications she had or she could have lost it

19    because she had traveled or she don't have it anymore

20    for any reason, somebody could have taken it from them.

21    There's all kinds of reasons that she may not have

22    enough medication.  And this is only a part of that day.

23         And what I recall is that she also developed some

24    sores and foot problems that may give her additional

25    pain that was not her usual pain amount.  There's other

49

1          Have you ever reviewed the coroner's report?

2     A.   No.

3     Q.   That's not something you would have in your file?

4     A.   Well, they do send one to me, but I don't

5     remember seeing it.

6     Q.   You don't remember reviewing it?

7     A.   No.

8     Q.   To your knowledge, have you ever reviewed the

9     toxicology report that was performed on

10    Ms. Hall-Hussain's blood when she was found dead?

11    A.   No.   It probably would be connected to the

12    coroner's report.   I think I would remember it if I saw

13    it.

14    Q.   To your knowledge, have you ever seen

15    Ms. Hall-Hussain's death certificate?

16    A.   I actually might be the one filling it out

17    because it would come to me.   So I must have seen it.

18    Q.   It would come to you as her treating physician?

19    A.   Yeah.   I believe they would send it to me even if

20    I wasn't attending to the patient at the time of her

21    death.   So I may very well have filled it out.   But in

22    the case that goes to coroner, if the cause of death is

23    unclear, that they may not have sent it to me as I

24    usually would get them.   So I may not be the one that

25    filled it out.   Because the coroner's case might be

56

1    different than straightforward.

2    Q.   Okay.  I'm going to show that to you in a minute.

3    But before we do that I want to close the loop on this

4    extra page that you copied.

5    And just for the record, we copied a page of

6    notes that appears to be dated April 3rd, 2007.  The

7    first part of the entry reads, it looks like, "Left foot

8    getting worse."  And it appears to also be notes taken

9    by Ms. Myers, the nursing student.

10    And it's your testimony that this is the first

11    page of Exhibit 112?

12    A.   Yes.

13    Q.   So these two pages are meant to be one continuous

14    note?

15    A.   Yes.

16    Q.   Okay.  We've introduced this as Exhibit B, then,

17    to the record.

18    And a few lines in, Dr. Chen, it reads, "She

19    feels depressed because of pain and doesn't want to

20    bother" -- and what's the rest?

21    A.   "With blood sugars, BG, blood glucose."

22    Q.   If this notation is in these notes, is that

23    because Ms. Hall-Hussain told you that she was

24    depressed?

25    A.   Yes.

57

1    Q.  Did Ms. Hall-Hussain have a history of

2  depression?

3    A.  Yes.

4    Q.  Could you describe that more for me?  Do you

5  remember, for instance, the first time that she

6  indicated to you that she was depressed?

7    A.  I don't remember the first time, but I remember

8  in general that that has always been an issue.  In fact,

9  it would be very strange to have someone who has chronic

10  pain and her medical problems not to be depressed.  So

11  that wasn't surprising at all.

12    Q.  Did you ever treat Ms. Hall-Hussain for her

13  depression?

14    A.  Yes.

15    Q.  What did you do to treat her for that?

16    A.  Medications.

17    Q.  Which medication?

18    A.  The last thing I can recall is Cymbalta, and

19  there could be others that we tried.

20    Q.  Do you have any recollection based on your

21  recollection or notes whether Ms. Hall-Hussain's

22  depression was getting better or getting worse, in

23  general?

24    A.  In general there's fluctuations.  Sometimes it

25  will be worse; sometimes it will be better.  If I have

58

23

```
1   the transcript will be assumed to be correct as is and

2   an unsigned copy can be used for all purposes at trial

3   or any other instance in this matter.

4            MR. STENNETT:  And that her signature be

5   under penalty of perjury.

6            MR. LASKA:  Yes, of course.

7            MR. STENNETT:  So stipulated.

8            MR. LASKA:  All right.  Talk to you in

9   awhile.

10        (The deposition was concluded at 10:05 a.m.)

11

12                          .   . .

13

14  I hereby certify under penalty of perjury that the

15  foregoing is true and correct.

16  Executed this _____ day of _____, 2008,

17  at _____.

18

19  _____

20  CHIA CHEN, M.D.

21

22

23

24

25
```

76

```
 1    STATE OF CALIFORNIA )
                          ) ss.
 2    COUNTY OF HUMBOLDT  )

 3        I, Valerie Walker, CSR No. 7209, a Certified

 4    Shorthand Reporter of the State of California, hereby

 5    certify that the witness in the foregoing deposition was

 6    by me duly sworn to testify to the truth, the whole

 7    truth and nothing but the truth in the within-entitled

 8    cause; that said deposition was taken at the time and

 9    place therein stated; that the testimony of the said

10    witness was reported by me and was thereafter

11    transcribed under my direction into typewriting; that

12    the foregoing is a full, complete and true record of

13    said testimony; and that the witness was given an

14    opportunity to read and correct said deposition and to

15    subscribe the same.  Should the signature of the witness

16    not be affixed to the deposition, the witness shall not

17    have availed himself/herself of the opportunity to sign

18    or the signature has been waived.

19        I further certify that I am not of counsel or

20    attorney for either or any of the parties in the

21    foregoing deposition and caption named, or in any way

22    interested in the outcome of the cause named in said

23    caption.

24

25
      Valerie Walker
      Certified Shorthand Reporter
```

77

25

# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CASE NO. C 08-01466 JCS

. . .

TERRI SMITH and MICHELLE
SMITH FREGOSO,

            Plaintiffs,

   vs.

STONEBRIDGE LIFE INSURANCE
COMPANY,

           Defendants.
_____/

D E P O S I T I O N

O F

DEPUTY CORONER ROY HORTON

. . .

FRIDAY, APRIL 11, 2008

. . .

11:00 A.M.

. . .

VALERIE WALKER, CSR #7209

**CRNICH DEPOSITIONS**
626 H STREET, EUREKA, CA. 95501
TELEPHONE 707 443-4879
FAX 707 443 4870
CONFERENCE ROOMS

1                      A P P E A R A N C E S

2

3   FOR THE PLAINTIFFS:

4       Law Offices of Jack Stennett
        BY:   Jack Stennett, Esq.
5                 and
        Barbara Casino, Esq.
6       501 West Broadway, Ste. 1340
        San Diego, CA  92101
7       (619) 544-6887
        (Appearing telephonically)

8

9

    FOR THE DEFENDANTS:
10
        MANATT, PHELPS & PHILLIPS, LLP
11      BY:   Joseph Laska, Esq.
        11355 West olympic Boulevard
12      Los Angeles, CA  90064
        (310) 312-4352
13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              2

1                          I N D E X

2

3
EXAMINATION                                    PAGE

4    By Mr. Laska                              5, 69

5    By Mr. Stennett                            62

6

7

8
EXHIBITS              DESCRIPTION              PAGE

9    A         Coroner's File

10   B         Death Investigation Report      20

11   C         Death Certificate

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    3

1  UNITED STATES DISTRICT COURT

2  FOR THE NORTHERN DISTRICT OF CALIFORNIA

3  CASE NO. C 08-01466 JCS

4

5

6  TERRI SMITH and MICHELLE
   SMITH FREGOSO,

7
                  Plaintiffs,
8
        vs.
9
   STONEBRIDGE LIFE INSURANCE
10 COMPANY,

11                Defendants.
   _____/
12

13      Be it remembered that pursuant to notice, and on

14 Friday, April 11, 2008, commencing at the hour of

15 11:00 a.m. thereof, at the offices of Crnich

16 Depositions, Certified Shorthand Reporters, 626 H

17 Street, Eureka, California, before me, Valerie Walker,

18 Certified Shorthand Reporter Number 7209 for the State

19 of California, personally appeared

20           DEPUTY CORONER ROY HORTON,

21 a witness in the above-entitled action, called by the

22 Defendant, who, after having been duly sworn to testify

23 to the truth, the whole truth and nothing but the truth,

24 was interrogated and examined in said cause.

25

4

```
 1          EUREKA, CALIFORNIA; FRIDAY, APRIL 11, 2008

 2                     11:00 A.M.

 3                     .    .    .

 4

 5              DEPUTY CORONER ROY HORTON,

 6       having been duly sworn, testified as follows:

 7

 8                     EXAMINATION

 9   BY MR. LASKA:

10      Q.  Good morning, Deputy.

11      A.  Good morning.

12      Q.  If you could state your name for the record,

13   please.

14      A.  Roy W. Horton, H-O-R-T-O-N.

15      Q.  What does the W stand for?

16      A.  Wilbur.

17      Q.  Is that W-I-L-B-U-R?

18      A.  Yes.

19      Q.  Have you ever been known by any other name?

20      A.  No.

21      Q.  We just met before we went on the record, but

22   again, my name is Joe Laska.  I'm an attorney.  I

23   represent Stonebridge Life Insurance Company in

24   connection with a lawsuit filed by the daughters of a

25   woman named Diane Geraldine Hall-Hussain.  The lawsuit
```

1    A.    Yes.

2    Q.    Do you remember approximately how many

3  photographs you took of the scene?

4    A.    Maybe a half a dozen, six, seven, maybe.

5    Q.    And you had testified that you also saw an empty

6  pill bottle on the bed?

7    A.    Yes.

8    Q.    Is that the pill bottle that you brought along

9  with you today?

10    A.    Yes.

11         MR. LASKA:    Counsel, Mr. Horton also brought

12  with him from the evidence locker, the pill bottle for

13  OxyContin.   And Mr. Horton, before getting on, called,

14  checked with his supervisor, and apparently is not

15  authorized to release it to be attached to the

16  deposition transcript.   But I think what I'll do is

17  maybe have him read off the information from the label.

18         MR. STENNETT:    Do you have a camera?   You

19  can take a photograph.

20         MR. LASKA:    I don't have a camera.

21         MR. STENNETT:    Or just photocopy the label

22  or whatever.

23         MR. LASKA:    It's on a round bottle, but

24  we'll try that.   And we'll attach it as an exhibit to

25  the transcript.

28

1          Maybe I'll save time by reading it into the

2     record.

3          Q.   Sir, it's a label from Lima's Professional

4     Pharmacy at 2097 Harrison Avenue, Eureka, California

5     95501.   It gives the phone number for the pharmacy,

6     (707) 441-8500.   Shows prescription Number N975022 for

7     Diane Hussain.   "Take one to two tablets by mouth every

8     eight hours."   It says, "Dr. Chia Chen, March 27, 2007."

9     It says, "180 OxyContin 40 milligram tabs.   No refills.

10    Tablet round, yellow."   And then there's a date that is

11    probably the expiration date, 10/08.

12          The pill bottle also contains a yellow label

13    along the side that contains a warning.   Says, "May

14    cause drowsiness, period.   Alcohol may intensify this

15    effect, period.   Use care when operating a car or

16    dangerous machinery, period.   May cause dizziness."

17          Is that accurate?

18    A.    That's correct.

19    Q.    And that was the pill bottle that you found lying

20    on the bed?

21    A.    Yes.

22    Q.    Were there any pills left in the bottle at the

23    time that you found it?

24    A.    Not in the bottle.

25    Q.    Did you see any pills at all in the area left?

29

1    A.   Yes.

2    Q.   Okay.  And how many and where did you see those?

3    A.   I saw one pill on the bed, and then pill bottles

4    on the night stand.

5    Q.   And when you said you found one pill on the bed,

6    were you able to identify what type of pill that was?

7    A.   Yes.

8    Q.   And what type was it?

9    A.   It was an OxyContin.

10    Q.   How did you know it was an OxyContin?  Are you

11    just familiar with that type of medication or did it say

12    OxyContin on it?  How are you able to identify it?

13    A.   No.  Most the time they'll have a descriptive

14    number on them, and we have a book that we use to --

15    it's *Ident-A-Drug* book, and we run numbers on them to

16    confirm that that's what the pill is.

17    Q.   Did you identify the pill at the scene?  Did you

18    have the book with you, or do you do that back at your

19    office?

20    A.   No, it was back at the office.

21    Q.   So there was only one pill of that type lying on

22    the bed?

23    A.   Yes.

24    Q.   And you later confirmed that that was an

25    OxyContin pill?

30

1    A.    Yes.

2    Q.    Did you conduct a search of her bedroom for any

3    other OxyContin pills?

4    A.    Yes.

5    Q.    And did you find any?

6    A.    No.

7    Q.    You said that there was some other medications on

8    the bedstand?

9    A.    Yes.

10    Q.    Do you recall what other medications were there?

11    A.    Again, I'll refer to my report.

12    Q.    Okay.

13    A.    SLIC 0071 is the Bates number.  Forgive my

14    pronunciation.

15    Q.    I don't make you pronounce it.  In the third

16    paragraph on 0071, it says "Those medications included,"

17    and there's a list of several medicines.  Those are the

18    medicines that you found?

19    A.    Yes.

20    Q.    And you took that down in your handwritten notes?

21    A.    Yes.

22    Q.    And then later put them directly into this

23    report?

24    A.    Yes.

25    Q.    And according to your report, you also found an

31

34

1    don't know what the cause of death is.

2        Q.    So you're required to do an autopsy if you don't

3    have enough information?

4        A.    Yes.

5        Q.    And did you draw postmortem blood from

6    Ms. Hall-Hussain in this case?

7        A.    Yes.

8        Q.    And sent that to the lab?

9        A.    Yes.

10       Q.    Did you receive a report from the lab?

11       A.    Yes.

12       Q.    Now, is this the report that's attached to the

13   death investigation report?

14       A.    Yes.

15       Q.    And that is in the documents I gave you, numbers

16   73 and 74?

17       A.    Correct.

18       Q.    Is that the entire toxicology report, just two

19   pages?

20       A.    Yes.

21       Q.    How quickly did you get the results in this case,

22   if you recall?

23       A.    We have two methods when we deal with labs --

24   with our lab, Central Valley Toxicology.  We put a rush

25   on toxicology reports if it's going to be pending an

37

1  that number and draw conclusions from it?

2      A.  Our point of reference is the blood reference

3  ranges, that's on page 73 here, SLIC 0073, they give a

4  reference to help us determine what's effective level

5  and what's potentially toxic levels.

6      Q.  And according to this document, page 73, under

7  blood oxycodone it says, "Effective level .005-.05

8  milligrams per liter"?

9      A.  Correct.

10     Q.  And says, "Potentially toxic 0.2 milligrams per

11  liter"?

12     A.  Correct.

13     Q.  And based on your experience, that's meant to

14  indicate that the drug can be toxic at .2 milligrams per

15  liter?

16     A.  Correct.

17     Q.  And Ms. Hall-Hussain's blood level was above

18  that?

19     A.  Correct.

20     Q.  What conclusions did you draw from this

21  information, if at all?

22     A.  I drew a conclusion that the -- I briefed coroner

23  Frank Jager on the case, and we concluded since that was

24  potentially toxic that that would be the cause of death.

25     Q.  Did you at any point speak with

                                                        40

1    Ms. Hall-Hussain's physicians?

2        A.    Yes.

3        Q.    Which ones did you speak with?

4        A.    I believe I spoke to Dr. Chen.

5        Q.    Do you recall speaking with any other physicians?

6        A.    No.

7        Q.    Just Dr. Chen?

8        A.    Yes.

9        Q.    Do you recall when you spoke with Dr. Chen?

10       A.    I believe it was when I was awaiting results for

11   the toxicology to come back.

12       Q.    Is it fair to say it would have been within a

13   couple days after April 9th?

14       A.    Yes.

15       Q.    Did you contact Dr. Chen personally?

16       A.    Yes.

17       Q.    Did you speak with her on the phone?

18       A.    Yes.

19       Q.    And tell me about your conversation.  What did

20   you say to her and what did she say to you in response?

21       A.    I specifically asked her about the oxycodone, and

22   she stated that, you know, she had been prescribed

23   oxycodone, and that she had recently upped the dosage

24   because the previous amount didn't seem to be effective

25   anymore.

41

1    A.   No.

2    Q.   Did you ask Dr. Chen if she had any thoughts or

3    opinions or impressions about what might have caused

4    Ms. Hall-Hussain's death?

5    A.   No.

6    Q.   Did you tell Dr. Chen anything about your

7    thoughts or impressions?

8    A.   I told her that she was over on her medication as

9    far as prescribed amounts for oxycodone.

10   Q.   Do you recall what, if anything, Dr. Chen said to

11   you in response?

12   A.   No.

13   Q.   When did you finalize the death investigation

14   report?  I'll represent that it appears to be dated May

15   1st of 2007.  Is that when you finalized it, to the best

16   of your recollection?

17   A.   Yes.

18   Q.   Ultimately what was your conclusion about

19   Ms. Hall-Hussain's death and the nature and the causes

20   of it?

21   A.   From the medication bottle I had and the

22   toxicology report, I concluded that the cause of death

23   was oxycodone intoxication.

24   Q.   And let's look at document Number 72, SLIC 0072.

25   I'll read from the top.  It says, "I signed the cause of

43

1  how much OxyContin is in her blood stream.  Whether how

2  frequently she took those or when she took them or how

3  many she took, I don't know.  All I depend on is the

4  level of the blood.

5      Q.  Okay.  How many conversations did you have with

6  Dr. Chen?

7      A.  Just one.

8      Q.  Just the one?

9      A.  Yes.

10     Q.  During your conversation with Dr. Chen, did you

11  discuss whether Ms. Hall-Hussain had been informed about

12  the risks of taking more OxyContin than was prescribed

13  by her physician?

14     A.  No.

15     Q.  Did Dr. Chen relate to you -- offer up any

16  information about any conversations like that that she'd

17  had with the decedent?

18     A.  No.

19     Q.  During your conversation, did Dr. Chen tell you

20  or represent to you in any way that the decedent had a

21  history of depression?

22     A.  No.

23     Q.  I'm going to show you another document.

24         MR. LASKA:  Counsel, this is SLIC 0067 and

25  0068.  It's the death certificate.

47

1    BY MR. LASKA:

2        Q.   Deputy, let me know if you recognize this

3    document.  It's not a very good copy.

4        A.   Yes.  It's a death certificate for Diane

5    Geraldine Hussain.

6        Q.   Did you complete this death certificate?

7        A.   Yes.

8        Q.   Correction.  It appears that coroner Frank Jager

9    actually signed the death certificate.  There's two

10   pages to this document.  The first page says at the top,

11   "Certificate of Death"?

12       A.   Yes.

13       Q.   And at the bottom that document purports to be

14   signed by Coroner Jager?

15       A.   Correct.

16       Q.   And in the middle of that death certificate it

17   reads, "Pending investigation"; is that correct?

18       A.   Yes.

19       Q.   And if you look at the version that I gave you,

20   in handwriting in the middle of the page it says 1 of 2,

21   which I assume is meant to indicate that it's continued

22   on the second page?

23       A.   Yes.

24       Q.   If you turn the page at the top it says,

25   "Amendment of medical and health data, hyphen, death."

1    generally within the Eureka Arcata area?

2    A.   I believe so.

3    Q.   You don't know for certain?

4    A.   No.

5    Q.   Were you able to determine the exact date of

6    Ms. Hall-Hussain's death?

7    A.   No.

8    Q.   Do you believe that it is possible that she could

9    have died days before her body was found?

10   A.   No, not days.  I believe hours.  That was my

11   speculation, that it was probably sometime before she

12   went to bed the previous night.

13   Q.   What did you base that impression upon?

14   A.   The condition of the body.  The body was still

15   warm to the touch where it made contact with the bed.

16   The body cools at about a degree and a half per hour.

17   Also lividity was proper for position; did not blanch,

18   so that means she'd probably been dead longer than seven

19   or eight hours.  And then rigor was firm in the

20   extremities but was easily broken.  So those are all

21   factors we look at as far as time of death.  But it was

22   hours, not days.  I believe it was the night before.

23   Q.   The night before, you believe?

24   A.   Yes.

25   Q.   What effect, if any, does that have on the

60

```
 1   higher range of potentially toxic.  We'll see those

 2   ranges three to four times higher.

 3      Q.  In this particular case there is no range for

 4   potentially toxic.  It just has a number of .2

 5   milligrams?

 6      A.  Yes.  That's the reference given by the lab.

 7      Q.  Okay.  So, again, carrying through this thought

 8   process, it was consistent, if you were thinking that

 9   this was a suicide, you would expect to see what kind of

10   a level of oxycodone --

11         What would you expect to have found as to the

12   toxic level of Ms. Hall-Hussain's blood system of

13   oxycodone if you were suspecting this was a suicide?

14             MR. LASKA:  Object.  It calls for

15   speculation.  It's an improper hypothetical.

16             You can answer the question.

17             THE WITNESS:  On Ms. Hall-Hussain's level it

18   was .2 milligrams per liter.  Oh, that's potentially

19   toxic.  Hers was .25.  Excuse me.

20   BY MR. STENNETT:

21      Q.  If it was atypical what you found to be a

22   suicidal attempt or actually suicide, what is the range

23   that you would expect to find?

24      A.  Typically what we find is that the number would

25   be more like 1.2 to 3.2.  So you'd be over another
```

64

1   decimal point into the 1.2 -- 2.2, 3.2.

2       Q.   Okay.   So that was one of the factors that you

3   took into account in considering that this is an

4   accidental overdose as opposed to a suicidal overdose;

5   is that correct?

6       A.   That's correct.

7       Q.   The other factors you indicated I think was there

8   was no suicide note?

9       A.   Correct.

10      Q.   Is that something that you typically in your

11  experience find when you conclude there's a suicide?

12      A.   I would say probably we find a note 50 percent of

13  the time.

14      Q.   Then the other factor you considered was with

15  family members, correct?

16      A.   Yes.

17      Q.   There had been no discussion with family members,

18  she appeared to enjoy her family, enjoy her life.

19      A.   Correct.

20      Q.   Now, was this amount of oxycodone in her system,

21  .25, would you describe that as being the high end of

22  potentially toxic level or the low end of potentially

23  toxic level?

24      A.   The low end.

25      Q.   Would the number of hours that you indicated was

65

1   the probable time of death, hours before you found her

2   on April 9th, the morning of April 9th, would you expect

3   any substantial change during that period of time in her

4   blood level?

5       A.   Drugs have half-lives, and some drugs have --

6   there's a whole different science on half-lives of

7   drugs.   Certain drugs have -- let's use a four hour

8   half-life.   So after four hours, that drug will be half

9   effectiveness.

10      Q.   I understand that, Deputy.   That's when somebody

11  is alive and metabolizing the drugs in their system.

12      A.   Correct.

13      Q.   What about after death; what's the opinion, as

14  you understand it, with regard to the diminution of the

15  blood levels of drugs?  .

16      A.   That's a debatable subject, and toxicologists

17  debate that subject.   But I'm not a toxicologist.   I'm

18  not sure what the levels would be postmortem.

19      Q.   Okay.   Did you make an assumption at all in your

20  findings here?

21      A.   No.   I don't assume on those.   I just go by --

22  you know, the black and white of the report.

23      Q.   Okay.   Do you have any idea based on the

24  prescription amount contained in your report -- no, let

25  me back up.   You didn't have a prescription amount.   Oh,

66

44

1  yeah, on the bottle.  Based on the prescription amount

2  on the bottle, would you be able to tell us what you

3  would expect to find in Ms. Hall-Hussain's blood of the

4  oxycodone?

5     A.  No.

6     Q.  Now, looking at the death certificate, is it my

7  understanding that you consulted with coroner Horton on

8  this matter?

9     A.  Coroner Jager.

10     Q.  I'm sorry.  Coroner Jager.  I'm looking at the

11  wrong line.

12     A.  Yeah, coroner Jager.

13     Q.  You consulted with him in filling out the death

14  certificate?

15     A.  Not in filling out the death certificate.  We --

16     Q.  In coming to a conclusion as to the cause of

17  death, then?

18     A.  Correct.

19     Q.  And so the two of you agreed that the cause of

20  death was oxycodone intoxication?

21     A.  Yes.

22     Q.  Based on your investigation and the findings of

23  the labs?

24     A.  Yes.

25     Q.  And discussions with family members and the

```
 1   questions.

 2                   Anything else, Counsel?

 3          MR. STENNETT:  No, nothing here.  Thank you.

 4          MR. LASKA:  Can we just incorporate the same

 5   stipulation from the last deposition?

 6          MR. STENNETT:  That's fine.

 7          (The deposition was concluded at 12:45 p.m.)

 8

 9                          .   .   .

10

11   I hereby certify under penalty of perjury that the

12   foregoing is true and correct.

13   Executed this  _____ day of  _____, 2008,

14   at  _____.

15

16   _____

17   ROY HORTON

18

19

20

21

22

23

24

25
```

74

```
 1   STATE OF CALIFORNIA )
                         ) ss.
 2   COUNTY OF HUMBOLDT  )

 3       I, Valerie Walker, CSR No. 7209, a Certified

 4   Shorthand Reporter of the State of California, hereby

 5   certify that the witness in the foregoing deposition was

 6   by me duly sworn to testify to the truth, the whole

 7   truth and nothing but the truth in the within-entitled

 8   cause; that said deposition was taken at the time and

 9   place therein stated; that the testimony of the said

10   witness was reported by me and was thereafter

11   transcribed under my direction into typewriting; that

12   the foregoing is a full, complete and true record of

13   said testimony; and that the witness was given an

14   opportunity to read and correct said deposition and to

15   subscribe the same.  Should the signature of the witness

16   not be affixed to the deposition, the witness shall not

17   have availed himself of the opportunity to sign or the

18   signature has been waived.

19       I further certify that I am not of counsel or

20   attorney for either or any of the parties in the

21   foregoing deposition and caption named, or in any way

22   interested in the outcome of the cause named in said

23   caption.

24   _____

25   Certified Shorthand Reporter
```

75