UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRI SMITH, | Case No. C-08-01466 JCS |
| Plaintiff(s), | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| STONEBRIDGE LIFE INS. CO., | |
| Defendant(s). | |

## I. INTRODUCTION

Plaintiffs Terri Smith and Michelle Smith Fregoso ("Plaintiffs") brought this action against Stonebridge Life Insurance Company ("Stonebridge") for breach of contract and tortious bad faith. Plaintiffs' claims arise from Stonebridge's denial of their claim for benefits under an accidental death insurance policy following their mother's death from an overdose of prescription pain medication.

Stonebridge filed a Motion for Partial Summary Judgment ("Defendants Motion") on the breach of contract claim on August 13, 2008. Plaintiffs filed their own Motion for Partial Summary Judgement ("Plaintiffs' Motion") on the breach of contract claim on August 15, 2008. The Court held a hearing on the cross-motions on September 26, 2008 at 9:30 a.m. For the reasons stated below, Defendants' Motion is DENIED, and Plaintiffs' Motion is GRANTED in part and DENIED in part.

///
///
///
///

## II. BACKGROUND

### A. Facts[1]

Diane Geraldine Hall-Hussain ("Hall-Hussain") was insured under an accidental death/dismemberment policy (the "Policy") issued to her by Stonebridge. Joint Statement of Undisputed Facts ("JSUF") ¶ 1. The policy became effective on November 7, 2005, and provided accidental death benefits in the amount of $50,000 in the event of Hall-Hussain's accidental death. Id. Plaintiffs Terri Smith and Michelle Smith Fregoso, Hall-Hussain's daughters, are beneficiaries of the Policy in equal shares. JSUF ¶ 18.

Beginning in April 2005, Hall-Hussain's primary physician, Dr. Chia Chen, began prescribing her oxycodone,[2] a narcotic pain killer, to treat Hall-Hussain's intractable pain. JSUF ¶ 14. Chen advised Hall-Hussain of the risks of taking oxycodone, including the risk of overdose, and instructed Hall-Hussain not to take more than prescribed. Laska Decl. iso Def's Mot., Ex. 1 at 33:3-22; 36:4-7. Dr. Chen believed that Hall-Hussain understood those risk. Id. at 35:24 -35:3. Dr. Chen last saw Ms. Hall-Hussain on April 3, 2007, at which time she increased Hall-Hussain's oxycodone dosage from two 40 mg pills three times a day to three 40mg pills three times a day. JSUF ¶ 16.

When Hall-Hussain last saw Dr. Chen on April 3rd, 2007, she told Dr. Chen that she "feels depressed because of pain." Laska Decl iso Def's Opp., Ex. 1 at 57:18-24. Dr. Chen testified that Hall-Hussain had a history of depression and that "it would be very strange to have someone who has chronic pain and her medical problems not to be depressed." Id. at 58:1-19. Hall-Hussain's daughter, Michelle Smith Fregoso, submitted a declaration in which she stated that at the time of her death her mother "was very close with her entire family," financially supported her brother and fixed him meals every day. Fregoso Decl. iso Pl's Mot. at ¶¶ 4,5. She testified that her mother loved her family and had a zest for life. Id. at ¶ 12.

Unfortunately, Ms. Hall-Hussain was found dead in her home on April 9, 2007. JSUF ¶ 5. The Deputy Coroner who investigated the scene found a bottle of OxyContin containing only one tablet lying on the bed. SAE, Ex. B. Another OxyContin tablet that had spilled out of the open

---

[1] The Court relies on facts that it finds to be undisputed and, where the facts are in dispute, draws all inferences in favor of the party opposing summary judgment.

[2] Oxycodone is the generic version of OxyContin. JSUF ¶ 13; SAE Ex. J at 25:1-5.

2

1  bottle was found on the bed. Id. The label on the bottle stated that it had been filled on March 27,
2  2007 and had contained 180 tablets of 40mg each. Id. Hall-Hussain's daughter stated that after her
3  mother's death she discovered in her mother's handbag a pill organizer containing a week's worth of
4  her pills, and that her mother would also keep some of her medications in a medicine chest in her
5  bedroom. Fregoso Decl. iso Pl's Mot. at ¶ 15. There is no evidence that oxycodone was found in
6  either of these containers. Id. Smith-Fregoso did not speak to the Coroner's investigator about her
7  mother's custom or habit of keeping her medicines. Id.at ¶ 14.

8        The Death Investigation Report prepared by the Deputy Coroner stated that the manner of
9  death was "accidental." JSUF ¶ 9. The deputy coroner testified that he determined Hall-Hussain's
10 death was an accident based on the toxicology report, the lack of a suicide note, and from talking to
11 Hall-Hussain's family, who told the deputy coroner she was "a happy, normal person that
12 didn't–well, never threatened suicide to them." Stennet Decl. iso Pl's Mot, Ex. 2 at 45:5-12. The
13 toxicology report stated that the effective range for oxycodone was .005 to .05 mg/L, while the
14 potentially toxic range begins at .2 mg/L. SAE, Ex. B, p. 11. The oxycodone level in Ms. Hall-
15 Hussain's blood was measured to have been .25 mg/L.[3] Id. The Deputy Coroner testified that this
16 level of oxycodone in Hall-Hussain's blood was on the "low-end of potentially toxic," and that he
17 would expect the level of oxycodone for a suicide attempt to be in the range of 1.2 to 3.2 milligrams
18 per liter. Stennet Decl. iso Pl's Mot, Ex. 2 at 45:10-22. A final death certificate was issued on April
19 26, 2007 and listed the immediate cause of Hall-Hussain's death as "[o]xycodone intoxication."
20 JSUF ¶ 8. The Death Certificate states that the manner of death was "accidental." JSUF ¶ 9.

21       On April 27, 2007, Hall-Hussain's daughters made a demand to Stonebridge to collect the
22 accidental death benefit. JSUF ¶ 17. On June 12, 2007, Stonebridge sent a letter to Plaintiffs
23 denying their claim on the basis that Hall-Hussain's death fell within two exclusions in the Policy.
24 SAE, Ex. E. The exclusions cited by Stonebridge state:

> No benefit shall be paid for Injury that . . .
> 3. Is caused by or results from the Covered Person's taking or using any
> narcotic, barbituate or any other drug, unless taken or used *as prescribed by a*
> *Physician*; or . . .

---

[3] Dr. Chen testified that it is possible for a person to "overdose" even while taking a prescribed dose, if for example, "there was some change in your medical status that you couldn't metabolize the medication." Casino Decl. iso Pl's Opp. at 55:1-16.

> 7. Is due to disease, bodily or mental infirmity, or *medical or surgical treatment of these*.

SAE, Ex. A at p. 5 (emphasis added).

Plaintiffs filed the complaint in this action in the Southern District of California on September 5, 2007, asserting claims for breach of contract and tortious bad faith. The action was transferred to this Court on March 17, 2008. The parties now bring cross-motions for partial summary judgment on the breach of contract claim.

**B.     The Motions**

In its Motion, Plaintiffs ask the Court to determine that Plaintiffs are entitled to coverage under the Policy because Hall-Hussain's death was an accident and no exclusions in the Policy apply.

In support of its position that the death was an accident, Plaintiffs cite to evidence from the Coroner's Report determining the death to be an accident. On the other hand, Stonebridge asserts that because there is evidence that Hall-Hussain knew the risks of taking more Oxycodone than prescribed, and had a history of depression, there is a genuine issue of material fact as to whether her death was accidental or intentional.

Both motions ask the Court to determine whether the Policy exclusions cited by Stonebridge apply to Hall-Hussain's death. To the extent that Stonebridge denied coverage based on the drug exclusion, Plaintiffs assert that: 1) California Insurance Code section 10369.12 applies to Hall-Hussain's Policy; 2) Hall-Hussain's death would not be excluded under the statutory exclusionary language of section 10369.12; and therefore 3) because the Policy's language is less favorable than section 10369.12, section 10369.1 requires that the Policy's drug exclusion be read-out and replaced with the statutory language.

On the other hand, Stonebridge asserts that: 1) section 10369.12 applies only to group policies, not individual policies such as Hall-Hussain's; 2) even if section 10369.12 applies, the statutory exclusion still excludes Hall-Hussain's death; and 3) if the statutory language is interpreted to not exclude coverage, it is inconsistent with the type of coverage provided by the Policy and therefore inoperative under section 10323.

To the extent that Stonebridge denied coverage based on the medical exclusion, Plaintiffs

4

assert that this exclusion does not apply because Hall-Hussain "did not die as a result of treatment but rather died as a result of an accidental overdose of oxycodone." Pl's Mot at p. 10. In addition, Plaintiffs' assert that interpreting the Policy's medical treatment exclusion to apply to deaths caused by prescription drug overdoses is inconsistent with section 10369.12.

### III.     ANALYSIS

#### A.     Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the nonmoving party's claim, or to a defense on which the nonmoving party will bear the burden of persuasion at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc., 210 F.3d 1099 (9th Cir. 2000). Once the movant has made this showing, the burden shifts to the party opposing summary judgment to "designate specific facts showing there is a genuine issue for trial." Celotex, 477 U.S. at 323. To establish a "genuine" issue of fact when opposing summary judgment, a plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. Smolen v. Deloitte, Haskins & Sells, 921 F.2d 959, 963 (9th Cir. 1990). The Court need not "scour the record in search of a genuine issue of material fact." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996).

In an insurance coverage dispute, the interpretation of the terms of the insurance policy is a question of law for the court. Heighly v. J.C.Penney Life Insurance Co., 257 F. Supp.2d 1241,1250 (C.D. Cal. 2003). Because this Court's jurisdiction is based on diversity, California substantive law applies. Id. at 1251.

///

### B. Was the Death Accidental

In order to prevail on their Motion, Plaintiffs must show that there is no genuine issue of material fact that Hall-Hussein's death was accidental. In opposition to Plaintiffs' Motion, Stonebridge cites evidence that Ms. Hall-Hussain (1) was an experienced user of oxycodone, (2) knew the risks of taking too many pills, (3) with knowledge of those risks took more pills than prescribed and (4) had a history of depression and told her doctor shortly before her death, "I feel depressed because of pain." SAE, Ex. D at p. 16, Laska Decl. iso Def's Opp., Ex. 1 at 57:4-25. Based on these facts, Stonebridge argues that a reasonable trier of fact could determine that Ms. Hall-Hussain took the overdose intentionally, or was at least indifferent to whether she lived or died. Def's Opp. p.8. The Court agrees with Stonebridge that a genuine issue of material exists as to whether Hall-Hussain's death was accidental.

"In California, the burden is on the person claiming the accidental death benefits to establish that the insured's death resulted from an accident." Heighly, 257 F.Supp.2d at 1251. In most accidental death and dismemberment policies, as in Hall-Hussain's Policy, the term "accident" is undefined. Courts in California have defined an accidental death as one where "the death of the insured was objectively unexpected, unintended, and happened out of the ususal course of events." Heighly, 257 F.Supp. 2d at 1252 (citing Bornstein v. J.C.Penney Life Ins. Co., 946 F.Supp. 814 (C.D.Cal. 1996). A policy that insures against "accidental death," requires only "that the insured's death was not designed or anticipated by the insured, i.e., accidental death is an unintended and undesigned result even if caused by the insured's voluntary act." Heighly, 257 F.Supp. 2d at 1253 (citing Weil, 7 Cal.4th at 134-135). "Policies requiring only that there be proof of accidental death are construed broadly, such that the injury or death is likely to be covered *unless the insured virtually intended* his injury or death." Weil.7 Cal.4th at 140 (emphasis added; internal quotes omitted). See e.g. Pilcher v. New York Life Ins. Co., 25 Cal.App.3d 717 (1972) (holding that death by self-administered heroin overdose was accidental in policy covering "accidental death").

A jury could reasonably conclude that Hall-Hussain took more oxycodone than prescribed. Her body was found next to a near empty bottle of oxycodone. SAE, Ex. B. The number of pills missing from the bottle was greater than the number of pills she should have taken pursuant to her prescription, and the toxicology report showed a potentially toxic amount of oxycodone in Hall-

6

Hussain's blood. Id. Plaintiffs' have submitted evidence that Hall-Hussain also kept medicine in a pill organizer and a medicine chest. In the absence of evidence that oxycodone tablets were found in either of these locations, a jury could reasonably conclude that, of entire bottle of oxycodone, only two tablets remained.[4] Thus, the relevant question is not whether Hall-Hussain took more pills than prescribed, but rather when taking more pills than prescribed she "designed, anticipated" or "virtually intended" her death. Heighly, 257 F.Supp. 2d at 1253.

Plaintiffs cite to evidence which could support a finding that Hall-Hussain's death was not intentional. First, the Death Investigation Report detailed the findings of Deputy Coroner Horton that Hall-Hussain's death was an accident. JSUF ¶ 9. The Deputy Coroner testified that the bases for his conclusion were that: 1) the amount of Oxycodone in Hall-Hussain's system, .25 mg/L, was low for an attempted suicide, which usually involve levels in the range of 1.2 to 3.2 mg/L; 2) no suicide note was found; and 3) discussions with Hall-Hussain's family members indicated that Hall-Hussain had not been despondent or suicidal prior to her death. Stennet Decl. iso Pl's Mot., Ex. 2 at 45:10-22. However, Stonebridge notes that the Deputy Coroner conceded that suicide notes are present in only half the cases ultimately ruled to be suicides. Laska Decl. iso Def's Opp., Ex. 2 at 65:7-13. Furthermore, with respect to the Deputy Coroner's opinion regarding the expected level of oxycodone for suicide, Stonebridge noted that Deputy Horton is not a toxicologist. Id. at 65:25-67:5.

On the other hand, Stonebridge asserts that evidence in the record supports a finding that Hall-Hussain's death was intentional, not accidental. Hall-Hussain was an experienced user who understood the risks of taking oxycodone and had been instructed not to take more than the prescribed dose. Laska Decl. iso Def's Mot., Ex. 1 at 33:3-22; 35:24-36:3; 36:4-7. Furthermore, Hall-Hussain had a history of depression and had told Dr. Chen on April 3rd that she "felt depressed because of pain." Id. at 58:18-24. Five days after her dosage was increased, Hall-Hussain took more Oxycodone pills than she had been prescribed and died from oxycodone intoxication.

The evidence cited by Stonebridge is sufficient to create a genuine issue of material fact as to whether Hall-Hussain's was an accident. Accordingly, the Court DENIES Plaintiffs' motion for

---

[4]The Court overrules Stonebridge's objections to this testimony to the extent relates to Hall-Hussain's custom of keeping pills in a pill organizer and medicine chest.

partial summary judgment to the extent it seeks to adjudicate whether Hall-Hussain's death was accidental under the policy.

### C. The Policy Exclusions

While Plaintiffs have the burden of proving coverage under the Policy, Stonebridge has the burden of proving that an exclusion in the Policy applies. See Frazier Searle v. Allstate Life Ins. Co., 38 Cal.3d 425, 436 (Cal. 1985). Therefore, the question presented by both motions is whether there is a genuine issue of material fact as to the applicability of either the Policy's drug exclusion or medical exclusion to Hall-Hussein's death.

#### 1. Whether California Insurance Code Section 10369.12 Applies to Hall-Hussain's Policy.

The first question to be resolved is whether section 10369.12 applies to an individual accidental death policy such as Hall-Hussain's Policy.

Stonebridge asserts that California Insurance Code section 10369.12 and the other provisions cited by Plaintiffs apply only to group disability policies, and not individual policies. As support for this assertion, Stonebridge argues that "[s]ection 10270 (titled "Scope of Chapter") specifies the types of insurance subject to the provisions of Chapter 4." Def's Mot. at p. 11. Because section 10270 mentions "'selected group disability insurance' as well as certain enumerated categories of insurance covering more than one person (such as, for example, 'blanket insurance' and 'tuition refund insurance.')," but does not explicitly mention individual insurance, Stonebridge reads this provision as excluding individual disability insurance from the provisions of Chapter Four. Id. Stonebridge's reading of section 10270 is unsupported by the plain reading of that section, the structure and organization of the Code as a whole, and regulations and court decisions interpreting the Code.

The construction of a statute is a question of law to be decided by the Court. See Dean W. Knight & Sons, Inc. v. State of California ex rel Dept. of Transportation,155 Cal. App. 3d 300, 305 (Cal. Ct. App. 1985). "It is a fundamental principle of statutory interpretation that statutes are not construed in isolation, but rather, with reference to the entire scheme of law of which they are part so that the whole may be harmonized and retain effectiveness." Int'l Longshoremen's and

Warehousemen's Union v. Los Angeles Export Terminal, Inc. 69 Cal.App. 4th 287, 301 (Cal. Ct. App.1999).

First, the plain language of section 10270 does not support Stonebridge's statutory construction. Section 10270(a) reads "[Excluded insurance.] This chapter shall not apply to workmen's compensation insurance nor any policy of liability insurance with or without supplementary coverage therein, nor any policy or contract of reinsurance." § 10270(a). Notably, "individual disability insurance" is not included as type of insurance excluded from coverage by the chapter. §10270(a). Under the maxim of statutory construction, "expressio unius est exclusio alterius," where "exemptions are specified in a statute" the court "may not imply additional exemptions unless there is a clear legislative intent to the contrary." Rojas v. Superior Court, 33 Cal. 4th 407, 424 (Cal. 2004). Here, there is no evidence that the Legislature specifically intended to exclude individual disability insurance from coverage.

In addition, Stonebridge's interpretation of sections 10270 and 10369.12 is inconsistent with the structure and organization of the Code as a whole. The title of the relevant division ("Life and Disability Insurance"), and relevant chapter, ("Standard Provisions in Disability Policies") both refer to "disability" policies, not "group disability" policies. Even the relevant statute refers to "disability policies," and not "group disability policies." § 10369.12. Section 106 of the Insurance Code defines the term "disability" as including accidental death and dismemberment insurance policies, but makes no reference to the term applying only to "group" policies.[5] § 106. In other locations within the chapter, where a statute speaks to "group" policies only, it says so. See, e.g., § 10270.9 (titled "Group disability policy; prerequisites to issuance");§ 10270.98 (titled "Group Policies; reduction of benefits in case of other coverage; payment of benefits"). See also, California Practice Guide: Insurance Litigation, § 6:479 (Rutter 2008) (stating that "special doctrines apply to accidental death benefits payable under group insurance policies."). Similarly, where the Code speaks to "individual" disability insurance only, it says so explicitly. See, e.g., § 10270.98 (exempting "*individual* policies or contracts" from reduction of benefits provision);§ 10270.99

---

[5] As one California practice guide notes, "[a]lthough not specifically defined, the concept of individual disability coverage is implicit in the Insurance Code. For example....the Commissioner has issued extensive regulations regarding minimum benefit standards for individual policies and several bulletins regarding standards for approval of forms for individual policies." California Insurance Law & Practice, § 25.03[2] (Lexis Nexis 2008).

9

1  (defining "*individual* policies or contracts" as used in § 10270.98 as not including "selected group
2  disability policies");§ 10273.6 (titled "Renewal of *individual* health benefit plans; exceptions); §
3  10293 (allowing commissioner to "withdraw approval of an *individual* or mass-marketed policy of
4  disability insurance" if benefits are unreasonable in relation to the premium charged).

5  Finally, no court has held that section 10369.12 or the other provisions of Chapter Four are
6  inapplicable to individual disability policies.  If anything, the legal decisions interpreting provisions
7  within Chapter Four support the position that the chapter does apply to individual disability policies.
8  For example, in John Hancock Mut. Life Ins. Co. v. Greer, the California Court of Appeal held that
9  an incontestability clause in plaintiff's *individual* disability policy was mandated by section 10350.2,
10 a provision within Chapter Four.  60 Cal.App.4th 877, 880 (1st Dist. 1998).  Other courts in
11 California have held that other provisions in the chapter do not apply to group policies, and therefore
12 only apply to individual policies.  See e.g. Peterson v. American Life & Health Ins. Co., 48 F.3d
13 404, 410 (9th Cir. 1995) (noting that the  "Commissioner's regulations implementing section
14 10291.5(b)(7) *apply only to 'individual disability policies*.'") (emphasis added);  Twohey v. Lincoln
15 Nat. Life Ins. Co, 2000 WL 1006529, 3 (N.D.Cal.2000), *aff'd* 273 F.3d 817 (9th Cir. 2001) (holding
16 that "the Provisions set forth in [section 10369.6] of the insurance code *for use in individual policies*
17 ... are not applicable to group disability insurance")(emphasis added). Regulations interpreting the
18 relevant Code provisions also apply them to individual policies.  See, Ins. Regulation 10 CA ADC §
19 2232.30 (finding in reference to section 10369.1 that "[t]he instructions under the heading for each
20 optional uniform provision state whether or not, or to what extent the subject matter of each such
21 uniform provision *as set forth in the Insurance Code for use in individual policies* may be used in
22 group disability policies")(emphasis added).

23 Accordingly,  the Court finds that section 10369.12 and the other Insurance Code provisions
24 cited by Plaintiffs apply to Hall-Hussain's individual accidental death insurance policy.

25 **2.     Whether the Policy Exclusion is Less Favorable than the Statutory
            Exclusion**
26

27 Because section 10369.12 applies to Hall-Hussain's Policy, the Court must next consider
28 whether the Policy exclusion, "*unless taken or used as prescribed by a physician*" is less favorable
   to

10

1 Plaintiffs' than the statutory exclusion, "*unless administered on the advice of a physician*." Cal. Ins.
2 Code § 10369.12. If the policy provision is less favorable than the statutory provision, then the
3 statutory provision controls.  See e.g, Holloway v. J.C. Penney Life Ins. Co., 190 F.3d 838; Olson v.
4 American Bankers Ins. Co. of Florida, 30 Cal.App.4th 816 (substituting statutory language of
5 10369.12 for less favorable policy language).  In support of its Motion, Stonebridge asks the Court
6 to interpret "*administered on the advice of a physician*" to require an insured to take prescription
7 drugs  "*as prescribed by a physician*", i.e. to require that the dosage prescribed by the physician
8 have been taken, and no more or less.  Under this interpretation, the language of the Policy exclusion
9 would be no less favorable to Plaintiffs than the statutory exclusion because coverage for Hall-
10 Hussain's death would be precluded under either provision.

11 On the other hand, Plaintiffs' Motion asks the Court to interpret the statutory exclusion *"on*
12 *the advice of a physician*" more broadly.  In Plaintiffs' view, this statutory provision allows
13 coverage as long as the drug causing death was prescribed to the insured, regardless of whether the
14 prescribed dosage was taken.  Under this interpretation, section 10369.12  would not exclude
15 coverage here, even where an overdose was taken.  Plaintiffs argue that the policy provision,
16 allowing coverage for accidents involving prescription drugs only when the drugs were taken "*as*
17 *prescribed*," is less favorable and would exclude coverage.

18 For the reasons stated below, the Court agrees with Plaintiffs' interpretation of the two
19 provisions.  As a result, the statutory exclusion applies and does not exclude coverage for Hall-
20 Hussain's death.

21 Policy language should be interpreted in its "ordinary and popular" sense. Cal. Civil. Code §
22 1644.  Where the language of a policy is ambiguous, however, the policy is interpreted in favor of
23 coverage. See AIU Insurance Co. v. Superior Court, 51 Cal.3d 807, 821-822 (1990).  However,
24 when interpreting insurance policy language required by statute, the statute "must be construed to
25 effect not the intent of the parties, but the intent of the legislature; therefore the rules of statutory
26 construction apply." Galanty, 23 Cal.4th at 374.  "A policy provision will be considered ambiguous
27 when it is capable of two or more constructions, both of which are reasonable." Powerine Oil, Inc. v.
28 Superior Court, 37 Cal.4th 377 (Cal. 2005).

1  The statutory provision at issue reads:

2  A disability policy may contain a provision in the form set forth herein.
3  Intoxicants and controlled substances: The insurer shall not be liable for any loss sustained or contracted in consequence of the insured's being intoxicated or under the influence of any controlled substance *unless administered on the*
4  *advice of a physician.*

5 § 10369.12 (emphasis added).  Under section 10369.1, no insurance policy may include an exclusion

6 "respecting a matter" set forth in, *inter alia*, section 10369.12, unless the insurer uses language

7 identical to the language in the statute.  § 10369.1.  However, the insurer may use different wording

8 if such wording is submitted to and approved by the commissioner and the wording is not "*less*

9 *favorable in any respect to the insured or the beneficiary*."  Id. (emphasis added).

10  Here, both Stonebridge's drug exclusion and the statutory exclusion set forth in 10369.12

11 "respect" the same matter–losses caused by use of controlled substances.  Although Stonebridge has

12 submitted evidence that their language was approved by the commissioner, under 10369.1 the

13 statutory language controls if the Policy's language is "less favorable" to insureds.  See Olson v.

14 American Bankers Ins. Co. of Florida, 30 Cal.App.4th 816 (Cal.Ct.App. 1994) (substituting

15 statutory language of 10369.12 for less favorable policy language).  Therefore, in order to determine

16 whether "*as prescribed by a physician*" is less favorable to an insured than "*on the advice of a*

17 *physician,*" the Court must determine whether *"on the advice of a physician*" excludes coverage for

18 deaths caused by taking more prescription drugs than were prescribed.

19  Plaintiffs do not dispute the plain meaning of "*as prescribed by a physician*."  If operative,

20 this language would exclude coverage if the insured exceeded the prescribed dose and was injured as

21 a result.  For example in Ortega v. Aetna Life Ins. Co., the district court considered a claim for

22 benefits where the insured's policy excluded "loss caused or contributed to by...[u]se of alcohol,

23 intoxicants, or drugs, *except as prescribed by a physician*."  2007 WL 1125782 at *1 (S.D.Tex. Apr.

24 16, 2007).  In granting summary judgment for the insurer, the court cited evidence that the decedent

25 "took more methadone than was prescribed by her doctor."  "Accordingly, the administrator

26 reasonably found that [decedent's] death was 'caused or contributed to' by the use of drugs not

27 taken as prescribed by her physician."  Id. at *3.

28

As noted above, the evidence here shows that at the very least Hall-Hussain took more oxycodone than was prescribed to her by Dr. Chen. Therefore, if the Policy language "*as prescribed by a physician*" controls, coverage for Hall-Hussain's death will be excluded.

On the other hand, the rules of statutory interpretation and the cases cited by Plaintiff suggest that the statutory exclusion reading "*on the advice of a physician*" does not apply to Hall-Hussain's death. Only one court in California has interpreted the language in section 10369.12. See Legare v. Canada Life Assurance Co., No. 02-0798 (S.D. Cal. Feb. 18, 2004) (unpublished "Findings of Facts and Conclusions of Law")[6]. Legare involved an insured who died in a car accident while under the influence of prescription pain medication. The insurance company denied coverage based on an exclusion in the policy for deaths caused while the insured was "*under the influence of an intoxicant.*" Applying California law, the Court found that defendant's exclusion was more restrictive than the "*on the advice of a physician*" language mandated by section 10369.12. Accordingly, the Court rewrote the policy exclusion to conform with the statutory language. The insurer argued that coverage was still precluded because the statutory language "on the advice of a physician" required a showing "that decedent was taking the medication exactly as prescribed," and the insured's toxicology report showed he took more than prescribed. Id. at ¶ 17. In rejecting Defendants' argument, the court found that "the focus of the statutory limitation is to exclude the losses resulting from the illegal use of drugs as opposed to the legitimate use of a controlled substance pursuant to a physician's advice." Based on this rationale, the court found that "Defendants...failed to prove the substances found in Mr. Legare's system were not administered on the advice of a physician" and entered judgment for the insured. Id.

In finding that "*on the advice of a physician*" did not require a showing that the medication was taken exactly as prescribed, the court in Legare relied on a decision from the District of Nevada interpreting an almost identical Nevada statute. See Hummel v. Continental Casualty Ins. Co., 254 F.Supp.2d 1183, 1189 (D. Nev. 2003). Hummel involved an insured who died from an overdose of prescription oxycodone and whose policy excluded coverage unless the drug was taken "*as

---

[6]Stonebridge objects to Plaintiffs' citation of Legare on the grounds that Plaintiffs failed to properly request judicial notice of the decision. Legare is not binding authority, and it is not necessary for the Court to take judicial notice. Nonetheless, the Court overrules Stonebridge's objection to the extent Plaintiffs cite Legare as persuasive authority.

13

*prescribed by a physician.*" Id. at 1186. Like section 10369.12, the Nevada statute mandated that policies with drug exclusions apply language identical in words or effect to "*on the advice of a physician.*" Id. First, applying the rules of statutory construction, the court in Hummel found 'on the advice of a physician' to be ambiguous.

> The plain language of "administered on the advice of"...can and does in fact lead to differing results. The word administered for example has a number of definitions, one of which is "to give remedially." Webster's New International Dictionary 27 (3rd ed. 1986). Under this definition, administered could mean given on the advice of a physician and would not necessarily include the dosage advised by the physician.

Id. at 1189.

In Hummel the insured's prescription called for her to take one tablet of oxycodone twice a day to relive her migraine headaches. When she filled her prescription the bottle contained 60 tablets. The insured had been prescribed sixty pills of oxycodone to be taken twice daily to relieve her migraine headaches. Based on this prescription, the pill bottle should have contained 48 pills at the time of her death but was instead found empty. Despite the fact that the insured took many more oxycodone than she had been prescribed, the court held "the reasonable and appropriate construction of the term "*administered on the advice of*" included "Erica's situation where her physician gave her a prescription of Oxycodone to relieve her migraines." Id. at 1190. The court held that because "'taken as prescribed by' would require "exact adherence to the instructed dosages" while "on the advice of" would not, the policy exclusion applies a more strict standard and must yield to the statutory exclusion. Id. Applying the statutory exclusion, there was "no dispute that Erica's physician prescribed her oxycodone" and therefore "Continental breached the insurance contract by denying coverage." Id.

On the other hand, applying Ohio law, the Sixth Circuit in an unpublished decision held that an "on the advice of a physician" drug exclusion *did* preclude coverage where an insured took more prescription medicine than was prescribed. Dice v. General Electric Capital Assurance, 93 Fed.Appx. 68, 70 (6th Cir. 2004) (unpublished disposition).[7] Unlike Legare and Hummel, the "on the advice of a physician" language in Dice was not statutorily required by Ohio law, but rather was the language of the policy itself. The coroner had "determined that [the insured's] death was caused by acute multiple drug intoxication and that oxycodone, cocaine, alprazolam, and diazepam were the

---

[7]The Sixth Circuit rules permit citation to unpublished decisions. 6th Cir. R. 28(e).

contributing drugs." Id. at 69. The court cited to evidence that showed the insured had 300 mg of Oxycontin in her blood stream, while she should have had only 240 mg based on her prescription. The Sixth Circuit held that because the insured "ingested more Oxycontin than her physician had prescribed or advised that she ingest" "Oxycontin was not administered on the advice of [the insured's] physician" and therefore the policy exclusion is applicable. Id. Although Dice suggests that some states may disagree with the courts in Legare, and Hummel, it contains no analysis to explain its holding, and the Court finds it unpersuasive.

The Court concludes that the exception "on the advice of a physician" to the statutory exclusion involving controlled substances does *not* require that the Hall-Hussain have taken her prescription oxycodone in the exact dosages prescribed by her doctor. First, as noted by the court in Hummel, this statutory language is reasonably susceptible to two constructions: 1) requiring compliance with the physicians dosage instructions, or 2) merely requiring that the substance at issue have been prescribed. Therefore, under California law, we must "interpret the statute in light of the Legislature's intent." Galanty v. Paul Revere Life Ins. Co., 23 Cal. 4th 368,374 (Cal. 2000). As noted by the district court in Legare, "the focus of the statutory limitation is to exclude losses resulting from the *illegal use of drugs* as opposed to the legitimate use of controlled substance pursuant to a physician's advice." Legare, 02-0798, at p. 3 (citing Hummel, 254 F.Supp.2d at 1183)(emphasis added). There is no evidence that the Legislature intended this exclusion to limit or regulate the accidental overdoses of prescription drugs by this exclusion.

Stonebridge asserts that interpreting "on the advice of a physician" to include situations where an insured takes more medicine than prescribed would render the statutory provision meaningless. Pl's Motion, p. 14. Although Stonebridge does not say how the provision is meaningless, the plain language of the provision shows that it is not. Nothing in the interpretation followed by Legare and Hummel prevents an insurer from denying coverage caused by an insured's overdose of *illegal drugs*. In that sense, the provision has significant meaning.

Stonebridge additionally contends that such an interpretation would result in insurers being unable to protect themselves from the risk of an intentional overdose by an insured. Def's Opp., p. 18-19. For the reasons stated below, this contention is incorrect. As Plaintiffs point out, even if the statutory exclusion applies, beneficiaries still have the burden of proving that the insured's death

was "accidental." This burden is not necessarily easily met, as evidenced by the Court's denial of summary judgment for Plaintiffs on that same issue.[8]

Accordingly, the statutory exclusion applies and does not exclude coverage for Hall-Hussain's death.

### 3. California Insurance Code section 10323

Stonebridge asserts that if the Court interprets "on the advice of a physician" to allow coverage where an insured takes more drugs than prescribed, then the statutory exclusion would be inconsistent with the "type of coverage" provided by the Policy. "To the extent that the 'on the advice of a physician' language...may be construed...to cover a death caused by an overdose of prescription narcotics *intentionally* taken...it is inconsistent with the accidental death coverage provided under the Policy." Def's Opp., p. 15. Therefore, Stonebridge asserts that under § 10323 of the Insurance Code it can apply the more stringent, "as prescribed by a physician" language. The Court disagrees with Stonebridge that section 10323 applies in this instance.

Section 10323 provides:

> If any provision set forth in Article 4a or 5a of this chapter is in whole or in part inapplicable to or *inconsistent with the coverage provided by a particular form of policy* the insurer, with the approval of the commissioner, shall omit from such policy any inapplicable provision or part of a provision, and *shall modify any inconsistent provision or part of the provision in such a manner as to make the provision as contained the policy consistent with the coverage provided by the policy*.

Cal.Ins.Code § 10323 (emphasis added).

First, Stonebridge's focus on narcotics *intentionally* taken is misplaced. This language being interpreted is an exclusion from and accidental death policy. Under that policy, regardless of the wording of the exclusion, the insured has the burden of proving that the death was accidental. "Accidental death is an unintended and undesigned result *even if caused by the insured's voluntary act*." Heighly, 257, F.Supp.2d at 1253 (citing Weil v. Fed. Kemper Life Assurance, 7 Cal.4th 125 (Cal. 1995). As already noted above, the issue for coverage is not whether Hall-Hussain intentionally took more oxycodone than prescribed, but rather whether she did so intending to die. In

---

[8] Stonebridge also argues that interpreting "on the advice of a physician" to include accidental overdoses of prescription drugs is contrary to public policy and encourages prescription drug abuse. Def's Mot., p. 14. However, Stonebridge has not submitted any evidence that the Legislature's intent in drafting section 10369.12 was to discourage *prescription* drug abuse.

16

1  other words, the coverage provisions of an accidental death policy provide coverage for the
2  accidental consequences of an intentional overdose.
3  　　　Stonebridge has failed to explain how the interpretation of "on the advice of a physician"
4  supported by Hummel and Legare, is inconsistent with this coverage provided by the policy for
5  "accidental deaths."  It cannot be sufficient, under section 10323, for an insurer to claim that the
6  statutory exclusion is narrower than the exclusion they wanted to include in the policy.  The
7  statutory exclusion must be shown to be inconsistent with the *type of coverage* sought to be
8  provided.  No such showing has been made here.
9  　　　Therefore, the Court concludes that the Policy's drug does not apply to exclude coverage in
10 this case.
11 　　**5.    The Medical treatment exclusion**
12 　　　Lastly, Stonebridge asserts that even if the Policy's drug exclusion doesn't apply to Hall-
13 Hussain's death, Plaintiffs' claim was nonetheless properly denied because Hall-Hussain's death
14 was due to "disease, bodily or mental infirmity, or medical treatment of these."  Because
15 Stonebridge's interpretation is inconsistent with other provisions of the Policy and with the statutory
16 requirements of section 10369.1, et. seq., the Court finds that Hall-Hussain's death does not fall
17 within this exclusion.
18 　　　Exclusion 7 in the policy excludes coverage for any injury that , " [i]s due to disease, bodily
19 or mental infirmity, or *medical or surgical treatment of these*."  SAE, Ex. A at p. 5 (emphasis
20 added).
21 　　　Although the medical exclusion could possibly be read to apply to deaths caused by taking
22 prescription drugs if read in isolation, this exclusion must be read in the context of the entire
23 contract.  See, e.g., Employers Reinsurance Co. v. Superior Court, 161 Cal.App.4th 906, 919 (Cal.
24 Ct. App. 2008) ("[w]e consider the contract as a whole and interpret the language in context, rather
25 than interpret a provision in isolation.").  The medical treatment exclusion must be read in light of
26 the *exception* to the drug exclusion for deaths caused by drugs "prescribed by a Physician."  If one
27 were to read the medical exclusion as excluding coverage of deaths caused by prescription drugs, it
28 would be inconsistent with the drug provision which purports to allow coverage for deaths caused by
   prescription drugs.  Defendants' interpretation of the medical exclusion would therefore render the

17

exception to the exclusion providing coverage for deaths caused by prescription drugs meaningless. See Mirpad, LLC v. California Ins. Guarantee Assoc., 132 Cal.App.4th 1058, 1073. ("[A]n interpretation that gives effect to every clause is preferred over one that would render other policy terms meaningless."). The Court cannot agree with such a construction.

At oral argument, counsel for Stonebridge argued that the medical exclusion nonetheless applies because it is *broader* than the drug exclusion. However, it is precisely because the medical exclusion is broader that it cannot exclude coverage for deaths by prescription drugs. See Thompson v. Toll Dublin, LLC, 165 Cal.App.4th 1360, 1370 (2008) ("where general and particular contract provisions are inconsistent, particular controls general."). This interpretation is also supported by the special rules for interpretation of insurance contracts. See Great Western Drywall, Inc. v. Interstate Fire & Casualty Co., 161 Cal.App.4th 1033, 1040 (Cal. Ct.App. 2008) (exceptions to exclusions are "treated in the same manner as a coverage provision and therefore... interpreted broadly consistent with the insured's reasonable expectations," while "exclusionary clauses are interpreted narrowly against the insurer."). Here, no reasonable insured would expect that a policy which specifically allows coverage for deaths caused by prescription drugs would expect the same coverage to be excluded under a more general exclusion.

Finally, Stonebridge's interpretation of the medical exclusion fails in light of Insurance Code sections 10369.1 and 10369.12. Just as the subject matter of the statutory exclusion in section 10369.12 is "controlled substances" in general, the subject matter of the exception to that exclusion is "prescription drugs" in particular. Thus, to the extent the medical exclusion is read as pertaining to "prescription drugs," it cannot be less favorable to an insured than the statutory exception in section 10369.12. § 10369.1. As noted above, the statutory exception specifically *allows* coverage for deaths caused by drugs taken "on the advice of a physician." § 10369.12. Therefore, to the extent the medical treatment exclusion *excludes* deaths caused by drugs taken "on the advice of a physician" i.e., prescription drugs, it is "less favorable" to insureds and invalid.

Accordingly, the Policy's medical exclusion does not apply to exclude coverage in this case.
///

**IV.    CONCLUSION**

As set forth above, Plaintiffs' Motion is GRANTED IN PART and DENIED IN PART. Defendants' Motion is DENIED.

IT IS SO ORDERED.

Dated: October 7, 2008

_____

JOSEPH C. SPERO

United States Magistrate Judge